

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00025-CV

IN THE INTEREST OF E.P.C.,
A CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## OPINION

----------

On this court's own motion, we submitted this case en banc to resolve the conflict among opinions of this court as to whether former family code section 263.405(i) prohibits us from reviewing an issue that was properly preserved for appellate review in the trial court in compliance with the rules of civil and appellate procedure. As explained below, we reaffirm that former section 263.405(i) does not preclude our appellate review of those properly preserved issues.

## I. Introduction

Appellant J.B.C. (Father) appeals from the trial court's judgment terminating his parental rights to his daughter E.P.C. Father contends that the evidence is legally and factually insufficient to support the trial court's endangerment and best interest findings. Appellant A.L.A. (Mother) appeals from the trial court's judgment appointing the Texas Department of Family and Protective Services (the Department) as E.P.C.'s permanent managing conservator. Mother argues in one issue that the evidence is legally and factually insufficient to support the trial court's best interest finding. We affirm.

## II. Background

Father and Mother were married when E.P.C. was removed from them in October 2009, and the couple remained together at trial in September and October 2010.

Officer Loe Wiggins of the Fort Worth Police Department testified that she was dispatched to an apartment complex at about 5:00 p.m. on October 5, 2009. A maintenance man had found E.P.C., approximately ten and one-half months old, alone in an apartment. The apartment manager had called Father, who had stated that he was picking up Mother and would return shortly. He was delayed, and the apartment manager called him again. The apartment manager also called the police.

When Officer Wiggins arrived at the apartment complex office, Mother was holding E.P.C., who was not crying, and Father had not yet arrived. Mother told

2

Officer Wiggins that she had been out looking for work since 10:30 a.m. and had left E.P.C. with Father. She called Father to come pick her up, but E.P.C. was not with Father when he arrived to pick up Mother. Father said that the baby had finally gotten to sleep after crying all day, and he had not wanted to wake her, so he left her in the apartment alone.

Officer Wiggins testified that she contacted the Department because E.P.C. had been abandoned in the home. Officer Wiggins opined that leaving a child who is not yet one year old alone in an apartment endangered the child's physical and emotional well-being. She admitted that she saw no visible injuries on the child and that the child appeared healthy, clean, and free of disabilities. Officer Wiggins also acknowledged that she did not visit the couple's apartment.

Department investigator Callie Reynolds testified that the Department received a call that same day, October 5, 2009, and that the allegation was that E.P.C. had been left alone in the apartment for at least two hours. Father told her that E.P.C. had fallen asleep, but he was not sure when. He did not want to wake her, so he left her sleeping and drove to the Irving Wal-Mart, where Mother had been grocery shopping. He also looked for some tires at Wal-Mart. Reynolds testified that Father told her that he then received the call about the baby, and he and Mother left Wal-Mart to go home. He dropped Mother off at the apartment complex office while he went to the apartment to unload groceries.

Father told Reynolds that he worked nights but was home during the day with E.P.C. He tested positive for amphetamines but denied any drug use or

3

being on any meds, and the Department did not send his oral swab to a laboratory for further testing. Father told Reynolds that he was estranged from his own mother, and Father and Mother told Reynolds that they had no family members to whom they felt close.

Reynolds also testified about discrepancies in the parents' stories: (1) Mother had said that she called Father to pick her up at 3:00 p.m., not 4:00 p.m.; (2) Mother had said that they were changing a tire when the manager called, but Father had said that he was looking at tires at Wal-Mart; and (3) Mother had said that she never leaves the child with Father and that "she didn't have a life" and never left the home, but Father claimed that he watched E.P.C. often. Reynolds also testified that the apartment complex employees' story differed from that of the parents. The maintenance man found E.P.C. at 3:00 p.m. He waited until 3:15 p.m. in the apartment and then took her down to the office, and an apartment manager contacted Father at that time. Police were called at 4:57 p.m. Mother arrived at the apartment office at 5:00 p.m.

Reynolds was concerned primarily because E.P.C. had been left alone but also because Father showed absolutely no remorse. The Department removed E.P.C. from her parents that night. Reynolds stated that Mother was very upset about the removal but that Father appeared to be concerned only about whether he would lose his job.

Reynolds took the baby back to her office, where they stayed for a couple of hours. Reynolds was concerned about the baby's small size for her age. But

4

E.P.C. did not appear to have been battered; there were no bruises, swelling, or visible breaks. When changing E.P.C.'s diaper, Reynolds noticed that the bones in the baby's back were visible. Reynolds testified that E.P.C. was developmentally delayed, in that she was not able to roll over or crawl despite being over ten months old. She also could not push up. During that two-hour period, E.P.C. gulped down two eight-ounce bottles of formula "as if she had not eaten in a long period of time." Reynolds admitted, however, that the baby had been in the apartment office for at least six hours and that she did not know whether E.P.C. had been fed during that time.

Reynolds testified that Mother appeared to be appropriately bonded to, and appeared to show affection for, E.P.C. Reynolds further testified that she did not believe that Mother had any part in the decision to leave E.P.C. alone in the apartment.

Amanda Rogers, a Department investigator, testified that she accompanied E.P.C. to her first medical visit at Cook Children's Hospital on October 6, the day after the removal. Rogers was concerned that E.P.C. was very small for her age, and Rogers could feel some of E.P.C.'s ribs as she held the baby during the medical assessment. Rogers said the bones were visible when E.P.C. was unclothed. Additionally, Rogers, like Reynolds had the night before, noted that E.P.C. was literally gulping her food, so they "continued to allow her to eat, because she appeared [to be] still hungry." Rogers was concerned that E.P.C.'s hunger was not "just from her not eating for maybe that

5

morning or the night before" but was "maybe something that had been happening more than once." Rogers was also concerned that the baby so quickly formed "a kind of bond" with her, a stranger. Rogers testified that the examining nurse practitioner spoke to E.P.C.'s primary care provider, Dr. Goh, who told the nurse practitioner that E.P.C.'s "growth and weight were on the downward trend as far as where she should be for her age" but that they were not off the charts.

Eight days after the removal, Rogers visited Mother and Father's home. Rogers observed fourteen cans of baby formula but no baby food. The absence of food concerned Rogers because of the child's age, developmental level, and size. On that same day, Rogers supervised a parent-child visit. She was concerned that the child had "kind of a flat [a]ffect" when interacting with her parents and felt that the baby was more attached to her, a virtual stranger, than to her parents. Rogers testified that Mother would hand the child to Father but that Father would quickly give the child back to Mother. Rogers also testified, however, that Mother appeared to interact appropriately with the child.

Nicole Weber, another Department investigator, was also assigned to the case the day after the removal. In her interview with Mother that day, Weber learned that Mother had been raised by her grandparents and had little contact with her parents. Mother had last spoken with her mother a few months before the removal and has no contact with her father. Mother said that her father had abused alcohol and drugs when she was a child and that he had been physically and mentally abusive toward her, breaking her nose in one incident. She also

6

told Weber that there had been domestic violence between her parents during her childhood and that they had a history of Department intervention. Weber testified that there had been Department cases with Mother as the victim as recently as 2006 and 2007 with her parents as the alleged perpetrators and 2008 regarding her relationship with Father.[1] Weber also testified that Mother had been removed from her parents and placed in foster care. Mother did not indicate that she wanted E.P.C. placed with either of her parents.

Mother denied alcohol and drug abuse and any history of mental illness and stated that she was not employed but was looking for a job. Mother told Weber that she and Father had been married since February 2009. Mother said that she had had a normal pregnancy and delivery and that E.P.C. had no medical conditions. Mother also told Weber that she and Father had never left E.P.C. alone before and that he occasionally watched the baby during the day while she looked for work.

Weber testified that Father told her that he had been raised by his mother and stepfather and denied being abused or neglected as a child, but Father stated that he no longer had contact with his mother. Later, Weber testified that Father had told her that he had suffered emotional abuse at the hands of his mother when he was a child. He denied drug or alcohol abuse, domestic

---

[1]At the time of the 2008 referral (which was later ruled out), Mother was seventeen years old, and Father was forty years old. Mother and Father were married in February 2009.

violence, and any mental health issues. He told her that he was employed as a security guard, that he had known Mother his whole life, and that they had married in February 2009.

P.C., the child's former foster mother, testified that E.P.C. arrived at her home about 11:30 p.m. on October 5, 2009. P.C. said that she took E.P.C. to the doctor a few days later and that the baby weighed only 15.1 pounds. P.C. said that "the doctor was very concerned because [E.P.C.] was underdeveloped and underweight for someone her age." P.C. described E.P.C.'s physical and developmental health:

> She seemed very thin at the time. . . . When you would hold her up against your chest, you could feel her -- her spine and her ribs were very prominent at the time. Her waistline was very small also compared to some of the babies we had had in our home as well.
>
> . . . .
>
> She ate like a little pig. Excuse my language, but she was so hungry. And she would just -- she loved everything that was given to her, cereal, her fruits. It's like she couldn't get enough. And it seemed like once we started giving her food, she just started to blossom tremendously. Her teeth started coming in, her hair was getting fuller, and she was getting much more active.
>
> . . . .
>
> She was so starved for -- she -- she was so hungry, is what I mean to say. It's like she was -- she tried different things, different foods, and seemed to like everything we offered her. And a few months down the line, I believe it was in November, I will have to double check, she started on table foods, and really progressed well.
>
> . . . .

8

When we first got her, she couldn't even crawl. And the doctor noticed that, because he set her up on the table and he was looking at her. And she -- she was trying to get up, but it's like she didn't quite have the energy to get up there or the strength to get up there yet. And so he was -- he was quite concerned.

P.C. testified that Early Childhood Intervention Services (ECI) evaluated E.P.C. on October 28, 2009, and then two therapists began treating her two or three times a week, working with motor skills, balance, and crawling until the following January. Included in E.P.C.'s records from the pediatrician's office is an October 28, 2009 document, titled "Home Health Certification and Plan of Care," that provides that his principal diagnoses of E.P.C. were "lack of coordination," "muscle weakness," "failure to thrive," "[u]nspecified delay in development," and "delayed milestones." A month after her arrival in foster care, E.P.C. could still wear a dress sized three to six months even though she was almost twelve months old, but she was wearing clothes sized twelve to eighteen months by the time she left. By the time E.P.C. left that foster home in mid-February 2010, she had begun taking steps and had gained weight, at least four pounds in the first two months.

E.P.C.'s medical records show that her weight at birth on November 21, 2008, was seven pounds and four ounces. At her three-month checkup, she weighed twelve pounds and two ounces. At her six-month checkup, she weighed fifteen pounds. At her nine month checkup, she still weighed fifteen pounds. On October 12, 2009, a week after removal, she weighed fifteen pounds and one ounce.

9

E.P.C. quickly gained weight once she was living in foster care. On October 27, 2009, about three weeks after her removal, she weighed seventeen pounds. On November 6, 2009, E.P.C. weighed seventeen pounds and six ounces. On December 2, 2009, she weighed nineteen pounds and one and one-half ounces. On January 11, 2010, she weighed twenty-one pounds and eleven ounces. On March 3, 2010, she weighed twenty-four pounds and five ounces. Finally, at her eighteen-month checkup, she weighed twenty-five pounds.

Father's mother, B.M., testified that Father did not live with her until he was fifteen or sixteen years of age because she had relinquished her rights soon after his birth, and he was adopted. B.M. adopted him when he was a teenager after his former adoptive parents relinquished their rights. He told her that he had been sexually abused during his childhood by members of his former adoptive family, as a teenager in an incident at a lake, and during one of his multiple stays at a mental hospital. B.M. also testified that she and Father had had a sexual relationship for about twenty-five years, which ended only because he began a dating relationship with Mother, his first cousin once removed on his mother's side. B.M. also testified that Father had hit her hard in the head and had pushed a large wooden table into her abdomen near the beginning of his relationship with Mother.

Quentin Dean Little testified that Father and Mother had lived in his house from April 2008 until approximately June 2008. He testified that Mother, who was pregnant, "was dirty. She never picked up anything, never cleaned up anything.

10

She always had to have somebody do it for her. She was waited on hand and foot. . . . [I]t was a total mess." He also testified that another friend, Patrick, lived in the house at the same time. Patrick had Asperger's syndrome. Little testified that he saw Mother slap Patrick. Little testified that he would be concerned about Mother's ability to parent because Father always took care of everything and because she "t[ook] care of nothing." He further testified that she had been given an orphaned baby rabbit to care for, that his wife had taught her how, that he never saw Mother feed the baby rabbit, and that it died within two days. Little also testified that, after E.P.C.'s birth, he had seen Mother and Father without E.P.C. at Father's worksite and at Wal-Mart as many as eight times.

Little testified that he had known Father and B.M. for approximately ten years. Little also testified that he lived in B.M.'s house for approximately three months and that B.M. told him about her prior sexual relationship with Father in March 2009 or 2010 at her husband's funeral. Little denied having any sexual relationship with B.M., but he testified that Father approached him at B.M.'s husband's funeral and accused him of sleeping with B.M.

Julie Little, Quentin Little's wife, testified that Mother "didn't take care of herself, [Father] was the one taking care of her. She wouldn't get up and take a bath, she wouldn't help clean anything, she was taking things out of [Julie's] room and hiding them underneath the couch kind of like a child would do." Julie stated that Father would "make [Mother] get in the bathtub and he would bathe her."

11

Julie also testified that Mother neglected and mistreated animals:

> [Mother would] just abus[e] my dog. I found, you know, I came home one day and his ears were bleeding, and, of course, she had been mean to him previously, and it's like she claims she loved him, but she would turn around and kind of be rough with him, and I had to take him to the vet probably the next month because his ears wouldn't stop bleeding.

Julie admitted that she had not seen Mother hurt the dog but stated that the vet had said that someone had kicked the dog in his ear, and Mother was the only one at home with him. Julie confirmed that she had shown Mother how to take care of the baby rabbit but that Mother would not feed it even though the bottle "was right next to her where she was l[ying]."

Julie also testified that she saw Mother "pushing [Patrick] up against the brick wall and beating on him. She smacked him in the face a couple of times and then beat him in his chest and told him he was sorry and retarded and stupid." Julie stated that Patrick left about two weeks before Father and Mother moved out because "he was terrified of [them]. They kept on calling him names and [Mother] would claim he was googly-eyeing her, so [Father] would get all offensive and tie him to a chair and make him sit in the corner or -- you know, it was childish stuff."

Linda Phillips, the Department caseworker, testified that she first met with the parents eleven days after the removal and discussed the family service plan with them. Phillips was concerned because the parents had to be told to allow the child to drink juice during visitations and because although they brought a

blanket and some toys, they never brought food to the visits. When Phillips went for a home visit, Mother would not let her see the master bedroom and told her that E.P.C. had "no business" being in there.

Randy Waters, a Special Investigator with the Department, testified that he interviewed Father privately after a parent-child visit. When Waters told Father that he knew that Father had a Department history other than that involving Mother, Father acknowledged that he had formerly been adopted. He told Waters that he had been placed in two church homes as a child because his adoptive family no longer wanted him. Waters testified that he had information that Father had assaulted his first adoptive mother and had broken a window, resulting in one of the church home stays. Father told Waters that the allegations were not true. Father told Waters that his adoptive mother had thrown a knife at him and had punched him in the mouth and that one of his adoptive parents had knocked him out. When Waters asked Father about his stays at Terrell State Hospital, Father said that the Department had sent him there after removing him from his first adoptive home because the Department had no other place to put him. Father denied that he had been placed there because he had hurt people and pulled a knife on a child. He also denied that he had been sent to Terrell another time for setting a fire and exhibiting physical violence toward a teacher. After Father was discharged from Terrell, he was placed in a group home from which he eventually ran away. He told Waters that he went back home for a few

days, his first adoptive mother pulled a knife on him, and then he met and began staying with his birth mother, B.M.

Father denied to Waters that anyone had sexually abused him, except that Father claimed that B.M. had reached into his lap and touched him one time. Even though Father denied having a sexual relationship with his mother, he told Waters that B.M. had told Mother that he and B.M. had engaged in a sexual relationship because B.M. wanted to break up Mother and Father. Father also told Waters that Little and B.M. had a sexual relationship, and he showed Waters a picture of Little in a bed that Father claimed was B.M.'s.

Waters also interviewed Mother. She admitted that she had engaged in self-mutilation, cutting, while still a minor and showed him scars on her left arm. She denied purposely letting the baby rabbit die while living with the Littles. She stated that she and Father had left E.P.C. with relatives in Arkansas for a couple of weeks when the baby was two months old. Mother also told Waters that E.P.C. was with a baby sitter when Mother was seen with Father at his worksite.

Dr. Nichelle Wiggins, a clinical psychologist, testified that she performed psychological evaluations of both parents. She testified that Father told her that he was raised by his parents, grandparents, an aunt, and an uncle. He told her that he had a typical childhood and denied any abuse or mental health issues. Father also denied that he had ever exhibited assaultive or aggressive behavior. Dr. Wiggins administered a series of tests, and she concluded that Father is pretty intelligent but that he "is in a great deal of denial." She described him as

"extremely defensive." When asked if the knowledge that he had been in a twenty-five-year incestuous relationship with his mother would concern her, she replied,

> That would certainly speak volumes to one's -- the effect it would have on his emotional functioning, the way he interacts with other people in his relationships, like with his wife. It could impact his parenting because of lack of boundaries that he had learned and been modeled for him. It could affect him on so many levels and the people that he comes in contact with, so certainly that would be significant information.

She also stated that his marrying his first cousin once removed would go along with his problem of "lack of boundaries." She stated that, if left unresolved, issues with boundaries and attachment in a parent could put a child at risk:

> Well, you'll see neglect, and severe neglect, so leaving a child home alone would be an example of that. I've seen where children who are neglected when there are severe attachment issues, they may not develop at a healthy rate compared to other children their age because they're not receiving the stimulation, whether it's emotional, physical, or even nutritional-wise, so it can affect a child's overall well-being if there is neglect.

> When asked if a parent experiencing such issues would fail to recognize that a child was failing to thrive, she responded,

> Now, that happens quite a bit with people who are in total denial. Everybody else will see that child and say that child is just too thin, and that person can't see it, and it's usually denial. That's one of the things I noticed in his psychological: Denial, minimization, and repression, so when one uses those types of defenses on a regular basis, it can keep them from seeing where there is a need to take action and do something different, even if that means their child is severely malnourished and too thin. They may not see it that way.

15

Wiggins administered the same tests to Mother. Wiggins concluded that Mother was also in denial and repressing her feelings and that Mother tried to present herself in a positive light. Wiggins stated that Mother's physical responses (turning red and crying) indicated that she "was not sharing everything that was going on." She testified that Mother was not sharing very much and that "it's difficult to help someone when they will not open up and allow you to help them." Wiggins said that while Mother spoke of being abused and eventually disclosed that she had been sexually abused, Wiggins did not believe that Mother had resolved those issues.

Wiggins said that Mother had never been able to live independently and that she has dependent personality traits. Wiggins also testified that Mother's lack of structure has made it difficult for her to know how to impose structure and had led to her making poor decisions that put her child and herself at risk. Wiggins stated that Mother had a lack of insight and understanding that seemed to contribute to her poor decisions. When asked whether her assessment was consistent with a parent whose child has failure to thrive, Wiggins replied, "Sure. For a young mother who doesn't have someone there to help her and guide her, sure. I mean, that's not uncommon." When asked whether a child would be safe when parented by someone with unresolved child abuse and mental health issues, Wiggins replied,

> No, not -- if there is aggression towards animals, people, and that person is not admitting that they have problems that they need to address and want to address, then who is to say that a child would

16

not become a victim? I mean, I wouldn't know, but the probability does increase that abuse can happen or neglect if you have those types of issues unaddressed.

Wiggins testified that Mother admitted that she had a limited support system.

Jessica Juarez, the CASA advocate, stated that she had seen E.P.C. approximately twice a month since January 2010. Juarez testified that E.P.C. is doing very well in her current foster home and is very healthy, sweet, content, and easy-going. She is bonded with her foster family and comfortable in her foster home. The foster parents would be interested in adopting her if she were available. Juarez opined that the foster parents could meet E.P.C.'s needs and provide her with a safe and loving home. Father and Mother did not testify.

After the bench trial, the trial court found that both parents (1) engaged in conduct or knowingly placed E.P.C. with persons who engaged in conduct which endangered her physical or emotional well-being and (2) knowingly placed or knowingly allowed E.P.C. to remain in conditions or surroundings which endangered her physical or emotional well-being. The trial court also found that termination of the parent-child relationship between Father and E.P.C. would be in the child's best interest and terminated the parent-child relationship between them. But the trial court found that termination of the parent-child relationship between Mother and E.P.C. was not in E.P.C.'s best interest and denied termination of that relationship. The trial court also found that the appointment of either parent as E.P.C.'s managing conservator would not be in her best interest because the appointment would significantly impair her physical health or

17

emotional development; found that the Department had "made a diligent effort to locate . . . a relative of the parent and afford [him or her] a reasonable opportunity to request appointment as managing conservator"; found that the appointment of the Department as permanent managing conservator was in E.P.C.'s best interest; and so appointed the Department.

### III.  Standards of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right."  *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).  "While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."  *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit.  Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also id.* § 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005). We review all the

evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsections (D) or (E) of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not

20

reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## IV. Father's Appeal

Father argues in one issue that the evidence is legally and factually insufficient to support the trial court's endangerment and best interest findings.

## A. Father's Statement of Points for Appeal

In 2008, in an en banc decision, this court held that former family code section 263.405(i) is "void as a violation of the separation of powers provision of the Texas constitution." *In re D.W.*, 249 S.W.3d 625, 645 (Tex. App.—Fort Worth) (en banc), *pet. denied*, 260 S.W.3d 462 (Tex. 2008) (per curiam). Specifically, we held in *D.W.* that section 263.405(i)

> is void because it violates the Separation of Powers Clause of the constitution to the extent that it forecloses our power to review issues properly preserved for appeal because the statute unduly interferes with our substantive power as an appellate court to rehear and determine issues on the merits that were decided in the court below.

*Id.* at 640; *see also In re A.J.M.*, No. 02-11-00137-CV, 2012 WL 2877457, at *1 (Tex. App.—Fort Worth July 16, 2012, no pet. h.) (op. on reh'g) (en banc).[2]

Thus, if an issue was properly preserved for appellate review in the trial court in compliance with the rules of civil and appellate procedure, section 263.405(i)

---

[2]Section 263.405(i) was repealed effective September 1, 2011, but it technically applies in this case because the trial court signed the judgment before September 1, 2011. Litigants whose parental rights are terminated by final orders rendered on or after that date need no longer file statements of points.

unconstitutionally interferes with our constitutionally conferred power to review the issue on the merits on appeal. *D.W.*, 249 S.W.3d at 640, 645; *see A.J.M.*, 2012 WL 2877457, at *1.

In this case, Father's first issue is properly before us. Father was not required to raise his legal and factual sufficiency complaints in the trial court to preserve them for appellate review because the case was tried to the bench. *See* Tex. R. App. P. 33.1(d) ("In a nonjury case, a complaint regarding the legal or factual insufficiency of the evidence . . . may be made for the first time on appeal in the complaining party's brief."). Thus, this court's holdings in *A.J.M.* and *D.W.*—that former section 263.405(i) violates the Separation of Powers Clause of the Texas constitution—require that we address Father's legal and factual sufficiency challenge on its merits. *See A.J.M.*, 2012 WL 2877457, at *1; *D.W.*, 249 S.W.3d at 640, 645.

## B. Endangerment Findings

We turn now to Father's legal and factual sufficiency challenge to the trial court's endangerment and best interest findings.

### 1. Statutory Endangerment

"Endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See*

22

*J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

## 2. Discussion

Father admittedly left ten-month-old E.P.C. alone in the apartment while he drove to pick up Mother from the store. The evidence is conflicting as to how long E.P.C. was alone in the apartment, but Reynolds testified that the apartment maintenance worker found E.P.C. at 3:00 p.m. and that Mother arrived at the apartment office at 5:00 p.m. There is also evidence that Father shopped for tires after leaving E.P.C. alone and that an hour and a half passed between the time of the first call to Father and the time Mother arrived at the apartment office to retrieve E.P.C. Reynolds also testified that Father showed no remorse about leaving E.P.C. alone and appeared to worry more about possibly losing his job. Father's act of leaving ten-month-old E.P.C. alone in the apartment endangered E.P.C.'s physical well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E); *see also In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005,

23

no pet.) (stating that "a child is endangered when the environment or the parent's course of conduct creates a potential for danger which the parent is aware of but disregards"). Moreover, the trial court heard additional conflicting evidence that Mother and Father had been seen in public without E.P.C. as many as eight other times. *See In re H.R.*, 87 S.W.3d 691, 698–99 (Tex. App.—San Antonio 2002, no pet.) (holding evidence legally sufficient and noting, among other things, that the appellant left the child in the care of a nine-year-old cousin while she went out drinking).

In addition to leaving E.P.C. unsupervised, the trial court heard evidence that E.P.C. was very small for her age and that the bones in her back were visible. Mother mentioned having occasionally used a baby sitter to watch E.P.C., but Mother and Father were E.P.C.'s primary caregivers. Mother and Father had taken E.P.C. to the doctor regularly, but her "growth and weight were on the downward trend as far as where she should be for her age," even though they were not off the charts. E.P.C. weighed only fifteen pounds and one ounce a week after removal. E.P.C. gained two pounds in the next two weeks and a total of four pounds in the two months after removal. E.P.C. also gained another two pounds by January 2010. The medical records reflect that shortly after removal, E.P.C. was diagnosed with muscle weakness, lack of coordination, delayed milestones, unspecified delay in development, and failure to thrive. *See In re T.T.F.*, 331 S.W.3d 461, 484 (Tex. App.—Fort Worth 2010, no pet.)

(discussing child's failure to thrive diagnosis and holding sufficient evidence supported endangerment finding under subsection (E)).

Father attempts to separate and minimize the distinct acts of leaving E.P.C. unattended and not providing her with sufficient nutrition, but Father's arguments merely point to conflicts in the evidence. We must leave the resolution of those conflicts to the factfinder. *See id.* (citing *J.P.B.,* 180 S.W.3d at 573). Moreover, Father's argument actually highlights that the Department presented evidence that E.P.C. was exposed to a course of conduct while living with Father, not a single act or omission, that course of conduct involving both the failure to provide E.P.C. with proper nutrition and leaving her home alone on numerous occasions.

Viewing all the evidence in the light most favorable to the termination judgment, and disregarding all contrary evidence that a reasonable factfinder could disregard, we hold that the evidence is legally sufficient to support a factfinder's firm conviction or belief that Father engaged in conduct that endangered E.P.C.'s physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E); *J.P.B.*, 180 S.W.3d at 573; *In re S.G.S.*, 130 S.W.3d 223, 238 (Tex. App.—Beaumont 2004, no pet.). Likewise, giving due deference to the factfinder, we hold that the evidence is also factually sufficient to support the trial

court's finding that Father engaged in conduct that endangered E.P.C.'s physical well-being.[3]  We therefore overrule this part of Father's sole issue.

## C.  Best Interest Finding

There is a strong presumption that keeping a child with a parent is in the child's best interest.  *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest.  Tex. Fam. Code Ann. § 263.307(a) (West 2008).  In determining the best interest of the child, the trier of fact in a termination case may use the following factors:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

---

[3]Along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination.  *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).  We thus need not address the trial court's section 161.001(D) finding.  *See id.*; *see also* Tex. R. App. P. 47.1.

26

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted). These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

E.P.C. is too young to have expressed any desire concerning the termination of Father's parental rights. Mother and Father had taken E.P.C. to the doctor regularly for checkups, and she did not have any visible injuries and was clean and appropriately dressed at the time of removal. However, Father admittedly left ten-month-old E.P.C. alone in the apartment, and Reynolds testified that Father showed no remorse for having done so. In addition, E.P.C. was diagnosed with failure to thrive and was noted to have muscle weakness, lack of coordination, unspecified delay in development, and delayed milestones. There is also evidence that E.P.C. had "kind of a flat [a]ffect" when interacting with her parents at a visitation eight days after removal, bonded easily with strangers, became very attached to each of her foster families, and excelled

27

since being placed into foster care. The trial court also heard testimony that Father only interacted briefly with E.P.C. at visitations and would quickly give the child back to Mother. Father completed his service plan, but there is evidence that he was not particularly forthcoming during the process and should have learned more than what he did from working services.

In addition, Father is estranged from his mother, and there is evidence that he may have engaged in an incestuous relationship with his mother for twenty-five years. Father denied having had any such relationship with his mother, but the trial court heard evidence that Father physically confronted Quentin Little, accusing him of having an intimate relationship with his mother, and that Father told Julie Little about the incestuous relationship before she learned of the relationship from B.M. The trial court also heard testimony that Father had physically assaulted his mother as recently as 2008, that Father has a history of physically assaultive behavior, and that he was exposed to sexual and physical abuse as a child.

Father, however, represented to Dr. Wiggins that he had a typical childhood, denying any abuse or mental health issues. Dr. Wiggins testified that Father is intelligent but that he is extremely defensive and has a "great deal of denial." She also described how Father's relationship with B.M. "could affect him on so many levels," including problems with a lack of boundaries and attachment disorders. Dr. Wiggins opined that Father had not dealt with these issues and that they could lead to his failure to recognize neglect—such as leaving a child

home alone or failing to feed and nurture the child—and prevent him from bonding with his own children.

Viewing the evidence in the light most favorable to the finding and judgment, we conclude that the evidence is such that the factfinder could reasonably form a firm belief or conviction that termination of Father's parental rights is in E.P.C.'s best interest. *See J.P.B.*, 180 S.W.3d at 573. We also conclude, viewing all the evidence in a neutral light, that the factfinder could reasonably form a firm conviction or belief that termination is in E.P.C.'s best interest. *See H.R.M.*, 209 S.W.3d at 108. We therefore hold that the evidence is legally and factually sufficient to support the trial court's best interest finding, and we overrule the remainder of Father's sole issue.

## V. Mother's Appeal

In one issue, Mother contends that the evidence is legally and factually insufficient to support the trial court's finding that the appointment of the Department as E.P.C.'s permanent managing conservator is in the child's best interest.

## A. Applicable Law

The Supreme Court of Texas has explained,

> Section 153.002 provides that the primary consideration in determining issues of conservatorship and possession of and access to the child is always the child's best interest. Section 153.005 authorizes the appointment of a managing conservator, and provides that the managing conservator must be "a parent, a competent adult, an authorized agency, or a licensed child-placement agency." The Code creates a rebuttable presumption

29

that a parent will be named a child's managing conservator, unless the court finds that such appointment would not be in the child's best interest "because the appointment would significantly impair the child's physical health or emotional development." . . .

        . . . .

        . . . [T]he quantum of proof required to support a termination decision differs from the level necessary to support a conservatorship appointment. Termination decisions must be supported by clear and convincing evidence. Due process compels this heightened standard because terminating the parent-child relationship imposes permanent, irrevocable consequences. On the other hand, a finding that appointment of a parent as managing conservator would significantly impair the child's physical health or emotional development is governed by a preponderance-of-the-evidence standard. These differing proof standards, in turn, affect the method of appellate review, which is more stringent for termination decisions than for those regarding conservatorship. In evaluating the factual sufficiency of evidence supporting termination, an appellate court must consider "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." Legal-sufficiency review is similarly heightened when parental rights have been terminated. Conservatorship determinations, in contrast, are subject to review only for abuse of discretion, and may be reversed only if the decision is arbitrary and unreasonable. Because different standards apply, evidentiary review that results in reversal of a termination order may not yield the same result for a conservatorship appointment. As we have said, a "finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance."

*J.A.J.*, 243 S.W.3d at 614–16 (citations omitted).

In light of this recent explanation by the Supreme Court of Texas of the different standards of review for termination and conservatorship, we decline Mother's entreaty that we apply a heightened standard to the trial court's

conservatorship determination in this case. Instead, as we explained a few years ago,

> The trial court has wide latitude in determining the best interests of a minor child. We will reverse the judgment of the trial court only when it appears from the record as a whole that the court has abused its discretion. A trial court abuses its discretion if it acts arbitrarily and unreasonably or without reference to guiding principles. An abuse of discretion does not occur as to factual matters as long as some evidence of a substantive and probative character exists to support the trial court's decision. Legal and factual sufficiency are not independent grounds for review in conservatorship cases, but they are relevant factors in deciding whether an abuse of discretion occurred. In determining whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we engage in a two-pronged inquiry: (1) Did the trial court have enough information upon which to exercise its discretion; and (2) did the trial court err in applying its discretion? The traditional sufficiency review comes into play with regard to the first question. With regard to the second question, we determine, based on the elicited evidence, whether the trial court made a reasonable decision.

> . . . .

> A court's primary consideration in any conservatorship case shall always be the best interest of the child. Courts may use the nonexhaustive list of *Holley* factors to determine the child's best interest. . . .

*In re W.M.*, 172 S.W.3d 718, 724–26 (Tex. App.—Fort Worth 2005, no pet.) (citations omitted). Because the *Holley* factors are set forth above, we do not repeat them here, but we apply them in deciding whether the trial court abused its discretion by finding that the appointment of the Department as E.P.C.'s permanent managing conservator is in E.P.C.'s best interest. *See id.* at 725–26.

31

## B. Discussion

Reynolds testified that Mother appeared to be appropriately bonded to and to show affection for E.P.C. Rogers similarly testified that Mother appeared to interact appropriately with the child. The trial court also heard testimony that Mother successfully completed her service plan and that Mother did not have any part in the decision to leave E.P.C. alone in the apartment. However, Mother does have responsibility for E.P.C.'s failure to thrive diagnosis because the evidence establishes that Mother was one of E.P.C.'s primary caretakers.

There is also evidence of Mother's occasionally callous behavior toward others. Quentin Little testified that he saw Mother slap Patrick, the man with Asperger's syndrome who was living at the Littles' home when Mother and Father lived there, and Julie Little testified that she had seen Mother push, hit, and verbally abuse Patrick. In addition, there is evidence that Mother allowed a baby rabbit to die after begging the Littles to keep it and promising to care for it and that Mother abused the Littles' family dog.

Mother has also not ever been able to live independently and has dependent personality traits, and her lack of structure causes her to make poor decisions that put herself and her child at risk. Dr. Wiggins opined that Mother's condition was consistent with someone whose child had been diagnosed as failure to thrive. Mother is not close with her family and does not have anyone other than Father to help her care for the child. She also has been the victim of physical and mental abuse through her childhood. Mother also admitted having

32

self-mutilated. Dr. Wiggins testified that Mother has not addressed the issues from her childhood and that she has repressed those feelings.

The evidence presented to the trial court is obviously conflicting, but we do not resolve the conflicts, for that is within the factfinder's province. We thus hold that the trial court had sufficient information upon which to exercise its discretion and did not abuse its discretion by naming the Department as E.P.C.'s permanent managing conservator. *See W.M.*, 172 S.W.3d at 725. We therefore overrule Mother's sole issue.

## VI. Conclusion

Having overruled Father's and Mother's respective issues, we affirm the trial court's judgment.


ANNE GARDNER
JUSTICE


EN BANC

DAUPHINOT, J., filed a concurring opinion.

WALKER, J., filed a concurring opinion, in which GABRIEL, J., joins.

DELIVERED: August 30, 2012

33



# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

**NO. 02-11-00025-CV**

IN THE INTEREST OF E.P.C.,
A CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## CONCURRING OPINION

----------

I agree with the majority's conclusion that the trial court did not abuse its discretion by appointing the Texas Department of Family and Protective Services as E.P.C.'s permanent managing conservator. I further agree that the trial court's judgment should be affirmed. But for the reasons expressed in my

dissenting and concurring opinion in *In re A.J.M.*,[1] I believe that J.B.C. (Father) forfeited his conclusory sufficiency issue.

In his sole issue, Father contends that the evidence is legally and factually insufficient to support the trial court's endangerment and best interest findings. In his timely-filed statement of points, Father stated,

> A new trial should be granted to [Father] because the evidence is legally and factually insufficient to support this Court's judgment. Specifically, the evidence is legally and factually insufficient to support this Court's judgment in that the State produced insufficient evidence to justify the termination of [Father's] parental rights.

Former section 263.405(i) provided that "a claim that a judicial decision is contrary to the evidence or that the evidence is factually or legally insufficient is not sufficiently specific to preserve an issue for appeal."[2] Based on the reasoning of my

---

[1] *See* No. 02-11-00137-CV, 2012 WL 2877457, at *12–14 (Tex. App.—Fort Worth July 16, 2012, no pet. h.) (op. on reh'g) (en banc) (Dauphinot, J., dissenting and concurring).

[2] Act effective Sept. 1, 2005, 79th Leg., R.S., ch. 176, § 1, 2005 Tex. Gen. Laws 332, 332 (adding subsection (i), requiring statement of points, to section 263.405 of the family code), *repealed by* Act effective Sept. 1, 2011, 82nd Leg., R.S., ch. 75, §§ 5, 8, 2011 Tex. Gen. Laws 348, 349 (deleting subsection (i) but noting that former section 263.405, including subsection (i), is still in effect for final orders rendered before September 1, 2011).

dissenting and concurring opinion in *In re A.J.M.*,[3] I believe that Father forfeited his issue.

LEE ANN DAUPHINOT<br>
JUSTICE

DELIVERED: August 30, 2012

---

[3]*See* 2012 WL 2877457, at *12–14.



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-11-00025-CV

IN THE INTEREST OF E.P.C.,
A CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## CONCURRING OPINION

----------

I concur in the majority opinion's disposition of this appeal.  For the reasons set forth in my concurring opinion in *In re A.J.M.*, No. 02-11-00137-CV, 2012 WL 2877457, at *10–12 (Tex. App.—Fort Worth July 16, 2012, no pet.) (op. on reh'g) (en banc) (Walker, J., concurring), I would hold that Father waived his sole issue on appeal by not including that issue in his statement of points and also by not making an as-applied challenge to former Texas Family Code section 263.405(i).  *See* Act effective Sept. 1, 2005, 79th Leg., R.S., ch. 176, § 1, 2005 Tex. Gen. Laws 332, 332 (adding subsection (i), requiring statement of points, to

section 263.405 of the family code), *repealed by* Act effective Sept. 1, 2011, 82nd Leg., R.S., ch. 75, §§ 5, 8, 2011 Tex. Gen. Laws 348, 349 (deleting subsection (i) but noting that former section 263.405 remains in effect for final orders rendered before September 1, 2011).  Accordingly, I would affirm the trial court's termination order.  Because the majority opinion affirms the trial court's termination order on different grounds, I respectfully concur.


SUE WALKER
JUSTICE


GABRIEL, J., joins.

DELIVERED:  August 30, 2012

2