

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-14-00180-CV

IN THE INTEREST OF C.L., A CHILD

On Appeal from the 242nd District Court
Hale County, Texas
Trial Court No. B38989-1301, Honorable Edward Lee Self, Presiding

October 7, 2014

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

In this termination of parental-rights case, the child C.L. was born in May 2012 to B.L., the mother, and R.R., the father. The Texas Department of Family and Protective Services filed an original petition for protection of C.L., for conservatorship, and termination in January 2013. The case was tried by jury in April 2014 and based on the verdict the trial court rendered judgment terminating B.L.'s parental rights to C.L. on the predicate ground of Family Code section 161.001(1)(E) and the finding that termination was in the best interest of C.L.[1] The Department was appointed sole managing

---

[1] See TEX. FAM. CODE ANN. § 161.001(1)(E),(2) (West 2014).

conservator of C.L. and R.R. was named possessory conservator.[2]  On appeal, B.L. challenges the final order, contending the Department failed to accommodate her mental disability according to the requirements of the Americans with Disabilities Act and the evidence supporting the predicate ground and best interest findings was legally and factually insufficient.  We will affirm the order of the trial court.

Background

C.L. was removed from his mother's care when he was about eight months old.  The Department's investigator involved in C.L.'s case testified that the specific factor prompting C.L.'s removal from B.L. was the child's failure-to-thrive diagnosis rendered by his pediatrician, Baoping Qian, M.D.  Contributing factors, she added, were B.L.'s failure to maintain continuous utility services in her home and her inability to properly address her schizoaffective disorder.  Later in trial, a Department caseworker opined that B.L. engaged in endangering conduct by failing to provide C.L. with adequate nutrition, resulting in the child's hospitalization.

Dr. Qian was C.L.'s pediatrician from birth until at least the time of his removal from B.L.  Evidence showed B.L. brought C.L. to the hospital emergency room in July 2012, complaining the child exhibited seizures.  Dr. Qian dismissed the complaint as "reflux."  He did not conduct a "brain study" of C.L.

In December 2012, Dr. Qian grew concerned with C.L.'s rate of weight gain.  According to medical records in evidence, between September and December 2012,

---

[2] At trial, the Department recommended appointment of R.R. as C.L.'s possessory conservator and he was so appointed in the court's final order.  R.R. does not challenge the final order on appeal.

C.L. dropped from the twelfth percentile to the first percentile on the growth chart. Dr. Qian asked B.L. to provide her son more food and return in one week for a follow-up appointment. B.L. did not return as requested. About a month later, B.L. brought C.L. to Dr. Qian's office. The doctor noted in thirty-four days C.L.'s weight had increased by only five ounces or 4.11 grams per day. According to Dr. Qian, C.L.'s weight gain should have been 20 to 30 grams per day.

Dr. Qian admitted C.L. to the hospital with a diagnosis of failure to thrive, possible child neglect, and developmental delay. Blood and urine tests were normal. During the five-day hospitalization C.L. received six to eight ounces of formula every three hours and baby food three times per day. The child gained an average of 71 grams per day. In the opinion of Dr. Qian, C.L.'s failure to thrive was mainly nutritional. C.L. was discharged from the hospital into the custody of the Department. He was then placed in a Lubbock foster home.

In trial testimony, Dr. Qian agreed C.L.'s rapid weight gain in the hospital and foster care after discharge supported a conclusion that B.L. did not properly feed the child. Dr. Qian testified that during the first year of life a child should thrive and gain weight as this "is very, very important" for development of the brain and organs.

After removal, C.L. and B.L. had weekly visits at a Department office in Lubbock. The Department drove B.L. from Plainview to Lubbock for each visit as B.L. had no transportation. Department workers testified to inappropriate actions by B.L. during visits. One noted at times B.L. displayed food in the presence of C.L. but did not share, even though he appeared hungry.

Throughout the case, B.L. was unemployed. Her source of income was chiefly government and private assistance. She struggled financially. Water service, and occasionally natural gas and electric services, were not consistent. In September 2012, a Department investigator contacted her concerning B.L.'s belief that C.L. was not her child. She thought C.L. was exchanged for another child in the hospital. At the time of the investigator's contact, B.L.'s water was disconnected for nonpayment. During October 2012 B.L.'s gas and electric services were disconnected. Although the Department and a church apparently assisted with payments for utilities, testimony showed utilities were disconnected on numerous occasions. Without water, the toilet did not function causing an odor. On one occasion, testimony showed, aside from getting water in buckets from her neighbors and landlord, B.L. had no plan for restoring water service. The difficulties continued after C.L.'s removal. During an August 2013 visit, the worker noted B.L.'s home had "a horrible stench." In November 2013, the utilities were connected and B.L. was apparently obtaining payment assistance from the local church. But at a February 2014 visit, the caseworker discovered B.L. had no gas or water service and no plan for reinstating these utilities. At the time of trial in April 2014, B.L.'s water had been disconnected for a month with no gas service since January 2014.

From January into April 2013, B.L. had a total of six sessions with a licensed professional counselor. He testified at trial that B.L. told him she was diagnosed with schizoaffective disorder, and he described two delusions B.L. discussed. She believed C.L. was switched with another child at birth and that her food supply was contaminated.

4

The counselor terminated B.L. as a client because she did not obtain psychiatric treatment of the schizo component of her condition, which is treated by medication. The counselor did not feel B.L. would abuse C.L. Rather, his concern was she would neglect the child while caught in "a break with reality." The counselor told B.L. she needed to obtain medication from MHMR.

On cross-examination, the counselor acknowledged he stated in a March 2013 e-mail to the caseworker that B.L. did not appear capable of caring for C.L. alone and that the best long-term plan was appointment of a relative as managing conservator while allowing B.L. visitation. He added that if B.L. took her medications as prescribed and made progress, she might reach a point of caring for C.L. "without a lot of support and supervision."

Case workers testified to contacts with B.L. during several months in 2013 when she exhibited confused or delusional behavior. At an April 2013 visit, she complained of her neighbors, and added her screen door kept "flying open" when no one was there. She believed "someone was messing with her." At a July 2013 visit, B.L. appeared disheveled. She was confused, often pausing to answer questions. During a November 2013 car ride from Plainview to Lubbock, B.L. talked quietly to herself, once laughing, then stomping her feet and giggling, crying at another point. Another Department worker also said she watched B.L. carry on a conversation with an unseen person and suddenly begin crying or laughing. At a January 2014 meeting with the caseworker, B.L. referred to hearing a female voice speaking to her.

5

At a March 2013 visit, B.L. disclosed she had not taken her medication since C.L. was removed in January. B.L. was not taking her medication in August 2013 because she had not picked it up. The caseworker then drove her to MHMR for that purpose. During December 2013 B.L. told the caseworker she believed she was pregnant even though testing was negative. Because of this belief, she was not taking her medication. At trial, B.L. testified she was not taking her medication because of side effects.

Before the child's removal, the Department provided formula for C.L. But B.L. believed the formula was not fresh, despite its 2014 expiration date, and disposed of it. Another worker said B.L. told her she threw away food in her home "because it tasted like dog slobber and dental water." She disposed of water because she believed it was contaminated. Workers testified to home visits during which they found little food in the house and B.L. expressing worries over contamination.

On cross-examination, a caseworker agreed that despite B.L.'s mental disorder, it was possible for C.L. to have a safe, stable environment and have a relationship with B.L. She acknowledged B.L.'s counselor had given such an opinion in his March 2013 e-mail. She further agreed the counselor believed the best long-term plan included visits and a relationship between C.L. and B.L. The caseworker acknowledged that even though one-on-one parenting instruction through the Department was recommended, it was not provided. She agreed the Department "dropped the ball on the parenting." It was also shown C.L. has not significantly improved statistically on the growth chart despite being in foster care for over a year.

Ten jurors answered affirmatively a broad form question inquiring of two predicate grounds for termination and whether termination was in the best interest of C.L.

Analysis

In her first issue, B.L. argues the case must be reversed and remanded to the trial court for an unspecified disposition because the Department failed to accommodate her mental disability according to the requirements of the Americans with Disabilities Act. B.L. does not tell us how evidence of a qualified mental disability under the ADA is treated defensively in a parental-rights termination case. Our supreme court has not addressed the issue. Two of our sister courts have, in theory at least, considered ADA compliance in the nature of an affirmative defense. *See In re C.M.,* 996 S.W.2d 269, 270 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (stating an ADA complaint in a parental-rights termination case constitutes an affirmative defense and a parent affirmatively contending the Department did not comply with the ADA must plead, prove, and secure findings sustaining the affirmative defense); *In re B.L.M.,* 114 S.W.3d 641, 649 (Tex. App.—Fort Worth 2003, no pet.) (similar holding). Other courts have rejected failure to comply with the ADA as a defense in termination proceedings. *See In re S.G.S.,* 130 S.W.3d 223, 229 (Tex. App.—Beaumont 2004, no pet.) (affirming trial court's refusal to allow amendment of pleadings to allege ADA noncompliance as affirmative defense; listing cases).[3]

---

[3] *See also In re C.M.S.,* 184 N.C. App. 488, 492, 646 S.E.2d 592, 595, *disc. review denied,* 361 N.C. 693, 654 S.E.2d 248 (2007) (noting a majority of jurisdictions holding a parent may not raise violations of the ADA as a defense to termination of

We need not decide the question here, however. Even if the defense can be raised in Texas termination proceedings, it was not raised in the trial court here and is thus waived on appeal. *See* TEX. R. APP. P. 33.1(a); *In re C.M.,* 996 S.W.2d at 270; *In re B.L.M.,* 114 S.W.3d at 649. There was no evidence, according to the requirements of the ADA, detailing how the Department should have accommodated B.L.'s mental condition but did not. In other words, there was no evidentiary standard presented by which the jury as fact finder could gauge the conduct of the Department vis-à-vis any relevant requirements of the ADA. Additionally, we are not directed in the record to, nor do we find, instances where B.L. requested accommodation from the Department according to the strictures of the ADA and was denied assistance. As an affirmative defense the theory of ADA compliance was neither plead nor proved and no instructions, definitions, or questions concerning such a theory were submitted to the jury. We overrule B.L.'s first issue.

In her second issue B.L. argues the evidence was legally and factually insufficient to support termination under Family Code section 161.001(1)(E) and through her third issue she argues the evidence was legally and factually insufficient to support a finding that termination was in the best interest of C.L.

But we are not shown, nor do we find, any record indication that B.L. preserved her legal and factual sufficiency complaints in the trial court. *See* TEX. R. APP. P.

---

parental rights have done so on the rationale that Congress enacted the ADA to eliminate discrimination against people with disabilities and to create causes of action for qualified people who have faced discrimination but did not intend to change the obligations imposed by unrelated statutes); *People ex rel. v. T.B.,* 12 P.3d 1221, 1224 (Colo. Ct. App. 2000) ("To allow the provisions of the ADA to constitute a defense to termination proceedings would improperly elevate the rights of the parent above those of the child").

8

33.1(a). "Important prudential considerations underscore our rules on preservation. Requiring parties to raise complaints at trial conserves judicial resources by giving trial courts an opportunity to correct an error before an appeal proceeds." *In re B.L.D.,* 113 S.W.3d 340, 350 (Tex. 2003). To preserve a legal sufficiency challenge for appeal following a jury trial, an appellant must have: (1) moved for an instructed verdict; (2) moved for judgment notwithstanding the verdict; (3) objected to the submission of a jury question; (4) moved to disregard the jury finding; or (5) moved for a new trial. *Cecil v. Smith,* 804 S.W.2d 509, 510-11 (Tex. 1991). While a legal sufficiency challenge may be preserved in a motion for new trial, it does not entitle an appellant to rendition of judgment. *Horrocks v. Tex. Dep't of Transp.,* 852 S.W.2d 498, 499 (Tex. 1993) (per curiam). A claim that the evidence presented during a jury trial was factually insufficient must be preserved through a point in a motion for new trial. TEX. R. CIV. P. 324(b)(2); *In re D.J.J.,* 178 S.W.3d 424, 426-27 (Tex. App.—Fort Worth 2005, no pet). "When a party fails to preserve error in the trial court or waives an argument on appeal, an appellate court may not consider the unpreserved or waived issue." *Fed. Deposit Ins. Corp. v. Lenk,* 361 S.W.3d 602, 604 (Tex. 2012).

Moreover, even had B.L.'s legal and factual sufficiency claims been properly preserved, we would find them without merit.

Under subsection (E), the Department must prove, by clear and convincing evidence, that a parent engaged in conduct or knowingly placed a child with persons who engaged in conduct that endangered the physical or emotional well-being of the child. TEX. FAM. CODE ANN. § 161.001(1)(E) (West 2014). As used in this statute, "endanger" means to "expose to loss or injury; to jeopardize." *In re M.C.,* 917 S.W.2d

9

268, 269 (Tex. 1996) (per curiam) (quoting *Tex. Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex. 1987)). In a termination of parental-rights case it is the further burden of the Department to prove by clear and convincing evidence that termination is in the child's best interest. *In re J.L.,* 163 S.W.3d 79, 84 (Tex. 2005).

A legal sufficiency review requires we view all the evidence in the light most favorable to the trial court's finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002); *In re T.N.F.,* 205 S.W.3d 625, 630 (Tex. App.—Waco 2006, pet. denied). A factual sufficiency review requires we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.,* 96 S.W.3d at 266. The inquiry must be "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *Id.* A court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved the dispute in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *In re J.F.C.,* 96 S.W.3d at 266 (quoting *In re C.H.,* 89 S.W.3d 17, 25 (Tex. 2002)); *In re T.N.F.,* 205 S.W.3d at 630.

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of a parent's conduct, including acts, omissions, or failures to act. *In re M.C.T.,* 250 S.W.3d 161, 169 (Tex. App.—Fort Worth 2008, no pet.); TEX. FAM. CODE ANN. § 161.001(1)(E)

10

(West 2014). Termination under subsection (E) may not be based on a single act or omission but instead requires proof the parent engaged in a voluntary, deliberate, and conscious course of conduct. *In re E.P.C.,* 381 S.W.3d 670, 683 (Tex. App.—Fort Worth 2012, no pet.); *In re M.C.T.,* 250 S.W.3d at 169. To determine whether a relevant course of conduct was established, a court may consider evidence of a parent's continued engagement in endangering conduct following the child's removal by the Department. *In re C.A.B.,* 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

It is not necessary that a parent's conduct be directed at the child or that the child actually suffer injury, and the specific danger to the child's well-being may be inferred from a parent's misconduct standing alone. *Boyd,* 727 S.W.2d at 533; *In re M.C.T.,* 250 S.W.3d at 168-69. As a general proposition, conduct subjecting a child to a life of uncertainty and instability endangers the physical and emotional well-being of the child. *In re R.W.,* 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied); *In re S.D.,* 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied). And "[n]eglect can be just as dangerous to a child's emotional and physical health as intentional abuse." *In re E.A.W.S.,* No. 02-06-00031-CV, 2006 Tex. App. LEXIS 10515, at *40 (Tex. App.—Fort Worth Dec. 7, 2006, pet. denied) (mem. op.) (citing *In re W.J.H.,* 111 S.W.3d 707, 715 (Tex. App.—Fort Worth 2003, pet. denied)).

Standing alone, mental incompetence and mental illness are not grounds for termination of the parent-child relationship, but when a parent's mental state allows her to engage in conduct endangering the physical or emotional well-being of the child, that conduct bears on the advisability of terminating the parent's rights. *In re C.D.,* 664

11

S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no pet.) (citing *Carter v. Dallas County Child Welfare Unit,* 532 S.W.2d 140 (Tex. Civ. App.—Dallas 1976, no writ)); *In re M.E.- M.N.,* 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied) ("a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child").

The primary factors to consider when evaluating whether termination is in the best interest of the child are the *Holley* factors, which include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams,* 544 S.W.2d 367, 372 (Tex. 1976); *In re T.N.F.,* 205 S.W.3d at 632. The *Holley* list of factors is not exhaustive and not all the listed factors need be proved as a condition precedent to termination. *In re C.H.,* 89 S.W.3d at 27; *In re T.N.F.,* 205 S.W.3d at 632.

The evidence of B.L.'s significant mental dysfunction, manifested in delusional behavior and depressive episodes; of her inability to maintain the drug-therapy regimen necessary to her mental stability; of her lack of employment and dependence on the assistance of others for basic needs and the resulting instability and dysfunction in her

12

home life; and of her unnecessary waste of formula, water and food caused by unjustified fears of contamination; coupled with the child's pediatrician's testimony supporting the conclusion B.L. deprived the child of proper nutrition while he was in her care combine to justify a firm belief or conviction that her conduct endangered the child's physical or emotional well-being.

The evidence to the contrary includes that showing the child had not improved significantly on the growth chart even after a year in foster care; that showing B.L. faithfully kept supervised visitation appointments with C.L.; and her counselor's opinion that mother and child should maintain a relationship. But we keep in mind that the jury was the exclusive arbiter of the facts, deciding what weight to ascribe to the evidence and whether to believe all, some, or none of the testimony of the witnesses. *In re D.G.G.,* 02-04-00336-CV, 2005 Tex. App. LEXIS 6200, at *10 (Tex. App.—Fort Worth Aug. 4, 2005, no pet.) (per curiam, mem. op.) (juvenile delinquency proceeding); *In re R.W.,* 129 S.W.3d 732, 742 (Tex. App.—Fort Worth 2004, pet. denied) (explaining the function of the fact-finder "is to judge the credibility of the witnesses, assign the weight to be given their testimony, and resolve any conflicts or inconsistencies in the testimony"). On the evidence the jury heard, it was free to reasonably believe, and to reach a firm conviction, that B.L. engaged in a course of neglectful conduct and termination of the parent-child relationship was in the best interest of C.L. The contrary evidence, even if it must have been believed by the jury, was not so significant as to preclude the necessary findings.

B.L.'s second and third issues are overruled.

Conclusion

Having overruled B.L.'s three issues on appeal, we affirm the order of the trial court.


James T. Campbell
Justice