

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**

**FORT WORTH**

## NO. 02-14-00305-CV

IN THE INTEREST OF M.D. AND
B.D., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-99212J-13

----------

## MEMORANDUM OPINION[1]

----------

Appellant R.D. (Mother) appeals from the trial court's judgment terminating her parental rights to her daughters M.D. (Marcy) and B.D. (Beth).[2]  In four issues, she contends that the evidence is legally and factually insufficient to prove any ground for termination under section 161.001(1) of the family code and

---

[1]*See* Tex. R. App. P. 47.4.

[2]To protect the anonymity of children connected to this appeal, we use aliases to refer to them and to other people associated with the appeal.  *See* Tex. Fam. Code Ann. § 109.002(d) (West 2014); Tex. R. App. P. 9.8(b)(2).

that the evidence is factually insufficient to prove that termination is in the children's best interest, as required by section 161.001(2).[3]  We affirm.

## Background Facts

Mother has four daughters by four different men.  She gave birth to Marcy in April 2006 and to Beth in November 2012.  In October 2013, Diana Pina, who works for the Department of Family and Protective Services (the Department), received an assignment to investigate allegations involving Marcy and Beth.  The Department had received a call from the police on October 11, 2013 stating that Marcy had been found with a seventeen-year-old woman who was not her mother and who had just been arrested for theft.  Pina interviewed Marcy, who said that the woman was her uncle's girlfriend and that she had not seen Mother in two days.  In contrast, Mother told Pina that she had left Marcy with the woman on the morning of the woman's arrest.

Pina learned that Mother had a criminal history and previous involvement with the Department.[4]  Mother admitted that she had recently taken Xanax and hydrocodone without a prescription.  Mother gave birth to J.T. (Julia) on October 14, 2013.  Upon her birth, Julia tested positive for cocaine and benzodiazepines.

---

[3]*See* Tex. Fam. Code Ann. § 161.001 (West 2014).

[4]Mother testified that in 2008, the Department became involved when there was a domestic dispute between her and the father of one of her children. Mother moved away soon thereafter, and the Department was not able to complete its investigation into that incident.

Tiara Sellars finished conducting the investigation that Pina had started. She learned that on several occasions, Mother had placed Marcy and Beth with inappropriate caregivers and had not returned for them in the time in which she stated she would.

Sellars confronted Mother about Julia's positive drug test; Mother said that she had never used cocaine, but she admitted to using marijuana, hydrocodone, and Xanax near that time (during her pregnancy with Julia and her custody and care of Marcy and Beth). Sellars asked Mother about the identity of Marcy's, Beth's, and Julia's fathers; Mother provided two names and approximate ages but could not tell Sellars information about how to locate those men. The Department removed Marcy and Beth from Mother's custody; Julia was not formally removed but began living outside of Mother's home.[5]

On October 16, 2013 (two days after Julia's birth), the Department filed a petition in which, among other relief, it asked to be named Marcy and Beth's temporary sole managing conservator, sought termination of Mother's parental rights to Marcy (who was seven years old) and Beth (who was not yet one) if reunification could not be achieved, and asked for the appointment of an attorney ad litem to represent the children. To its petition, the Department attached an affidavit from Sellars. She wrote about Mother's history with the Department, her

---

[5]In the time period leading up to the trial, Mother had not been visiting Julia. Julia and another one of Mother's four daughters, who was born in February 2008 and also did not live with Mother, had visited Marcy and Beth in their proposed adoptive home on a regular basis.

3

struggles with drug abuse, the circumstances of the children's removal from her care, and the lack of familial placement options for the children. Before and after holding an adversary hearing,[6] the trial court designated the Department as the children's temporary sole managing conservator.

In November 2013, the Department filed a family service plan and stated that its permanency goal was reunification. The plan assigned several tasks to Mother, including completing drug and alcohol assessments; submitting to random drug tests; following a visitation plan; participating in individual counseling and parenting classes; and maintaining contact with Adrionna Andrews, her caseworker, on a regular basis. In December 2013, after a status hearing, the trial court found that the service plan was reasonable and that Mother had reviewed and understood it. In February 2014, the Department moved the children out of foster care and placed them with distant relatives who desired to adopt them.

In April 2014, the Department filed a document stating that its permanency goal had changed from reunification to termination, that Mother was continuing to test positive for drugs, that she was not "cooperative with the services being offered to her," and that she had not established stable housing or income. In July 2014, the Department again informed the trial court that Mother was not

---

[6]*See* Tex. Fam. Code Ann. § 262.201(a) (West 2014).

4

adequately progressing on the service plan. That month, by the Department's request, the trial court also suspended Mother's visitation with the children.

After a bench trial in August 2014,[7] the trial court granted the Department's petition to terminate Mother's parental rights to Marcy and Beth. The court found that the Department had proved by clear and convincing evidence that termination was in the children's best interest; that Mother had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being; that Mother had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being; and that Mother had failed to comply with provisions of a court order that established the actions necessary for her to obtain the return of Marcy and Beth, who had been in the temporary managing conservatorship of the Department for not less than nine months as a result of their removal for abuse or neglect.[8] Mother brought this appeal.

**Legal and Factual Sufficiency**

In all of her issues, Mother challenges the sufficiency of the evidence to sustain the findings supporting termination of her parental rights to Marcy and

---

[7]Mother sought a continuance at the beginning of the trial so that she could have more time to complete services. The trial court denied the motion.

[8]*See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O), (2). The trial court also terminated the parental rights of Beth's and Marcy's alleged fathers.

5

Beth. In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, .206(a); *E.N.C.*, 384 S.W.3d at 802. "[C]onjecture is not enough." *E.N.C.*, 384 S.W.3d at 810. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802. For a trial court to terminate a parent-child relationship, the Department must establish by clear and convincing evidence that the parent's actions satisfy

6

one ground listed in family code section 161.001(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *E.N.C.*, 384 S.W.3d at 803; *In re J.L.,* 163 S.W.3d 79, 84 (Tex. 2005).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.*

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the Department proved appropriate grounds for termination. *See* Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not

7

reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

**Endangerment**

In her second issue, Mother contends that the evidence is legally and factually insufficient to support the trial court's finding that she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E). As we have explained,

> "Endanger" means to expose to loss or injury, to jeopardize. Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's . . . well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. Additionally, termination under (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. The specific danger to the child's well-being may be inferred from parental misconduct standing alone.

*In re E.P.C.*, 381 S.W.3d 670, 683 (Tex. App.—Fort Worth 2012, no pet.) (en banc) (citations omitted). To determine whether subsection (E) supports termination, we may look to Mother's conduct both before and after the children's removal from her care. *See In re O.R.F.*, 417 S.W.3d 24, 37 & n.11 (Tex. App.—Texarkana 2013, pet. denied).

Under these standards, the evidence supports the trial court's endangerment finding under subsection (E). First, the record shows that Mother has a history of using various illegal drugs. She did so before Marcy and Beth's

8

removal, when she had custody of them and was pregnant with Julia, so the trial court could have reasonably inferred that Mother had cared for the children under the influence of drugs or that the children had been in the presence of drugs. And when Mother's parental relationship with Marcy and Beth was at risk after their removal from her care, she continued to use illegal drugs, as evidenced by her inability to pass random drug tests throughout the course of the litigation below. A parent's use of illegal drugs may qualify as conduct that endangers the children's physical and emotional well-being. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *In re J.T.G.*, 121 S.W.3d 117, 125–26 (Tex. App.—Fort Worth 2003, no pet.) (explaining that "[d]rug addiction and its effect on a parent's life and ability to parent may establish an endangering course of conduct" and relying on a mother's continual abuse of drugs to support the termination of her parental rights); *see also In re D.J.W.*, 394 S.W.3d 210, 222 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) ("[I]llegal drug use . . . endangered D.J.W.'s emotional well-being because it increased the risk that his relationship with his biological mother would be permanently severed."); *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied) (explaining that a "parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of

9

losing a child, supports a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being").[9]

Next, the trial court could have inferred endangerment from the circumstances of the children's removal and information learned close to that time. The police alerted the Department that Marcy had been found with a seventeen-year-old woman who was arrested for theft. Marcy informed the Department that she had not seen Mother in two days preceding the arrest.[10] And during Sellars's follow-up investigation, she learned that Mother "had placed [Marcy] and [Beth] with inappropriate caregivers on several occasions and had not returned for them in the time that she stated and without provisions made for their care and safety." Conduct that subjects children to uncertainty and instability endangers their physical and emotional well-being. *In re M.N.G.*, 147 S.W.3d 521, 536 (Tex. App.—Fort Worth 2004, pet. denied) (op. on reh'g); *see also In re M.Y.G.*, 423 S.W.3d 504, 511 (Tex. App.—Amarillo 2014, no pet.) ("[T]he record demonstrates that Carl was not providing proper supervision or a safe environment for the children. Therefore, the trier of fact could form a firm belief or conviction that Carl's parenting fostered an endangering

---

[9]As detailed below, Mother also failed to complete her service plan, part of which was designed to treat her drug abuse. The trial court could have considered this failure as support for its endangerment finding. *See In re R.F.*, 115 S.W.3d 804, 811 (Tex. App.—Dallas 2003, no pet.).

[10]The trial court was entitled to reject Mother's contrary statement. *See E.P.C.*, 381 S.W.3d at 684.

10

environment . . . ."); *E.P.C.*, 381 S.W.3d at 683 (considering, in an analysis under subsection (E), that a parent had left a child without providing for the child's care and needs).

Also, the evidence shows that Mother caused emotional harm to Marcy shortly before the trial occurred. On July 4, 2014, in a neighborhood where the children's proposed adoptive family was attending a party, Mother appeared with a friend and, according to Marcy's perception of the event, attempted to steal her away. A scuffle ensued, and the children were upset and had to be separated from Mother. Jessica Barrientes, a licensed counselor, testified that this incident was "traumatic" for Marcy; it caused her to become angry and to fear that she would be "stolen" in future scheduled visits with Mother.

Regarding this incident, Mother testified that she went to the house where the party was occurring to give the children some new clothes. According to Mother, when she arrived at the house, Marcy did not look nice because her hair had not been combed. Mother became upset, began talking to the children, and asked the proposed adoptive mother (Melissa) if she could take Marcy across the street to get the clothes. Mother testified that Melissa told her that she could not take the children across the street and that after Mother stood there for a short time, Melissa's mother took Beth out of Mother's arms. Mother testified that she snatched Beth back and that Melissa's entire family began "trying to fight [her]." Mother stated that she retrieved the children's clothes from her car and apologized. Although the police arrived at the house, they did not arrest Mother.

Melissa's account of the July 4 incident differed from Mother's story. Melissa testified that on that day, Mother said that she wanted to bring clothes to the kids after failing to attend a visit with them earlier that week. When Mother arrived at the house where Melissa and the children were,

> she didn't come with the clothes. She just came, her and the friend, and so that kind of threw up some red flags to me . . . .
>
> So she got [Beth], and she sat down and, you know, playing with her or whatever, and I just sat there and watched her. But then she got up and she says, Well, I'm fixing to go and get the -- I left a sack in my car. I'm going to go get it. And I was like, [Mother], you know you can't take them nowhere. And she -- like, she moved, like *yanked away from me as if she wasn't going to -- like I couldn't stop her, you know.*
>
> So -- and I'm standing there talking to her back and forth, and she was like, Well, I take -- and she grabbed my daughter on -- she said, Well, I take her so you know I come back. And I was like, No. And my mom was standing behind, like, where I can see my mom, and my mom is like, What is going on? Because she see us talking, having these words, you know. And so my mom walked up and she grabbed [Beth], and [Mother] grabbed -- still had her leg and wouldn't let the baby's leg go. So my mom did shove her, and that was just to pull the baby to safety, *because she was trying to leave. And she actually told her friend, whoever this lady was with her, to get [Marcy].*
>
> . . . .
>
> She wouldn't get out the yard. So my husband literally picked [Mother] up and pulled her out to the street, out of these people yard, because she was lashing out at the owners of the home. And I -- yeah, these are grown people. I can't hold them. I'm really trying to help her. . . . [B]ut she cussed me out. She went all over my head with everything. [Emphasis added.]

Although Mother denied that she had intended to take the children away from the house that night, the trial court had discretion to reject this testimony

12

and accept the perceptions that Marcy and Melissa had of the incident. *See E.P.C.*, 381 S.W.3d at 684. And even if Mother did not intend to take Marcy and Beth away, it is undisputed that Marcy's emotional well-being suffered as a result of Mother's confrontational acts.

Similarly, the evidence establishes that Marcy suffered emotional harm by Mother's many missed visits with her during the course of the case and that the emotional harm caused Marcy to become physically aggressive. *See In re S.R.*, Nos. 07-14-00191-CV, 07-14-00192-CV, 07-14-00215-CV, 2014 WL 4977571, at *4 (Tex. App.—Amarillo Oct. 6, 2014, no pet.) (mem. op.) ("[T]he lack of visitation by a parent can emotionally endanger a child's well-being, supporting termination under subsection 161.001(1)(E).").

From all of these facts and the remaining evidence in the record, we conclude that the trial court could have formed a firm belief or conviction that Mother had engaged in conduct that endangered the children's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E). Thus, we conclude that the evidence is legally and factually sufficient to prove that ground for termination. *See id.*; *J.P.B.*, 180 S.W.3d at 573; *C.H.*, 89 S.W.3d at 28. We overrule Mother's second issue. Because the family code required the Department to prove only one ground for termination under section 161.001(1), we decline to address Mother's first and third issues, which challenge the sufficiency of the evidence to prove other grounds for termination. *See* Tex.

Fam. Code Ann. § 161.001(1); Tex. R. App. P. 47.1; *In re D.D.G.*, 423 S.W.3d 468, 475 (Tex. App.—Fort Worth 2014, no pet.).

**Best interest**

In her fourth issue, Mother contends that the evidence is factually insufficient to support the trial court's finding that termination of her parental rights is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(2). We review the entire record to determine the children's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (1) ground and best interest. *Id.* at 249; *C.H.*, 89 S.W.3d at 28.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402

14

S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)).

As explained above, Mother has a history of using illegal drugs; she did so while she had custody of Marcy and Beth and after their removal.[11] At trial, Mother asked the court to give her more time to address her drug problem. She admitted, however, that she had used marijuana within about a month of the trial, had used cocaine about three months before the trial, and had taken ecstasy within a week of the trial.

Carol Blackmon, the executive director of Merit Family Services, testified that she had attempted to arrange drug-abuse treatment services for Mother. Blackmon explained that Mother attended an initial intake and discussed a treatment plan (including counseling) but later failed to attend several scheduled meetings. Blackmon also explained that in January 2014, Mother tested positive for marijuana and cocaine and that after Mother later tested positive for illegal drugs again, Blackmon recommended inpatient treatment. According to Blackmon, Mother "refused the inpatient suggestion."

Mother also failed to show adequate progress on her service plan. The Department assigned Andrews, a conservatorship worker, to Marcy and Beth's case. Andrews prepared a service plan for Mother with the goal of persuading

---

[11]Mother also has a short criminal record. In November 2007, she pled guilty and was convicted for assault causing bodily injury, a misdemeanor. Also that month, Mother pled guilty to intending to pass a forged check and received deferred adjudication community supervision.

15

her to address her substance abuse along with other issues concerning the parenting of her children. Specifically, Andrews assigned Mother to complete a drug and alcohol assessment, follow the recommendations from the assessment, comply with random drug tests, complete parenting classes and individual counseling, provide verification of income and housing, and maintain visits with the girls. Mother initially maintained consistent contact with Andrews, but Andrews testified that toward the beginning of 2014, "contact just became sporadic and virtually nonexistent."

According to Andrews, Mother did not fully achieve any of the service plan's goals: she did not complete parenting classes or individual counseling (although she attended a few sessions),[12] did not verify any source of income or stable housing,[13] completed a drug assessment but was dishonest about her drug use, and visited the children regularly (although often tardily) at first but later stopped visiting them consistently.

When the Department asked Mother at trial why she had not completed more tasks from her service plan, she testified,

> I mean, it's hard. I can't just get up and just -- just -- I mean, it's
> hard. My kids got took. Like, it's something that I'm facing, and it's
> hard for me to wake up and think and know that my kids is gone. It's

---

[12]Andrews testified that parenting classes and individual counseling could have helped Mother develop decision-making skills to help curb her drug use and to help her deal with stress.

[13]Mother told Andrews that she was staying in Arlington with some friends; Andrews did not visit that home and assumed that it was not stable.

a process. It's nothing that I can just wake up and say, okay, I'm going to stop doing this. I'm going to stop doing that. It's a process but I'm trying. It's hard. It's hard. It's hard because those are the only – that's the only thing that I had, is my kids. That's all I have. I don't have family out here. I don't have no support. I don't have nobody to help me, so it's hard. It's hard.

In the six months preceding the trial, Mother had not progressed on any tasks in her service plan. Mother testified that part of the reason that she was unable to complete the plan was because she was depressed. On questioning from her own counsel, Mother expressed remorse for not completing the services.

Mother regularly visited the girls from November 2013 through February 2014 but saw them only sporadically from March 2014 through the trial in August 2014. The Department canceled some visits for various reasons. Regarding the visits that she missed with the children, Mother admitted some responsibility but testified that sometimes, the Department failed to bring the children to visits that she appeared for. When Mother visited the children, she acted appropriately; for example, she occasionally brought them snacks or clothes.

Marcy was typically excited to visit Mother. Andrews testified, however, that when Mother missed visits, Marcy became visibly upset and acted aggressively. Andrews confronted Mother about the inconsistent visits, and Mother said that she had "transportation issues." Eventually, the Department asked the trial court to order that no further visits occur because of Marcy's reaction to the missed visits and because of Mother's involvement in the July 4 incident.

Andrews explained that after Mother's repeated positive drug tests, in March 2014, the Department referred her to receive inpatient drug treatment, but she never followed through and once expressed that she did not need treatment and could "stop [using drugs] at any time."[14] During the Department's case, Mother submitted to four random drug tests; only one returned negative.

Andrews opined that Mother could not provide a safe and healthy home for the girls, could not meet their basic needs, and could not provide a drug-free environment. In contrast, Andrews testified that in the children's proposed adoptive placement, they were happy, well-adjusted, and stable. According to Andrews, the children's needs were being met there.

Mother testified that when she had custody of her children, they never went without shelter, food, or clothes. But the evidence raises doubts about Mother's long-term ability to support the children. At the time of trial, Mother, who was twenty-six years old, had last had a job in 2010; she testified that she had not been employed since then because she was "really being just a house parent [and] taking care of [her] kids." And Mother conceded that she does not have familial support that could help her care for the children. Mother described the home she was living in at the time of trial as a fully-furnished three-bedroom duplex. She testified that her friend, Breanne, was supporting her financially and

---

[14]Andrews's testimony indicated that Mother's no-shows were the main reason that she did not receive inpatient treatment. Mother suggested that problems with paperwork hampered her ability to receive treatment.

18

had been doing so for some time. She also testified that Breanne had a car that she let Mother use to look for jobs but that Mother "just [had not] found" a job. Mother testified that Breanne does not support Mother's drug use and has encouraged her to get clean.

The removal of the children from Mother's care and her inability to reunite with them by completing services and abating her drug use caused them emotional trauma. Barrientes became Marcy's therapist in March 2014. At the time of the trial in August 2014, Marcy had met with Barrientes almost twenty times. Barrientes described Marcy as a "very smart little girl" and "very verbal." According to Barrientes, Marcy struggled with behaving aggressively toward other children, with anxiety about "her situation," and with expressing anger appropriately. But in the months that Barrientes counseled Marcy, her aggressive behavior lessened, and she began to openly discuss her feelings. Barrientes testified that at the time of trial, Marcy was in a "stable place."

Barrientes recognized that Marcy loved and missed Mother but said that Marcy was disappointed with Mother. At one point, Marcy told Barrientes, "I knew [Mother] wouldn't do what she needed to do for me." Another time, Marcy said that "[e]verybody [was] more important" to Mother than her. Regarding Mother's failure to complete her service plan, Marcy "knew that [Mother] was not following through with her homework."

Concerning Mother's inconsistency in attending visits with Marcy, Barrientes testified,

> [Marcy] was always really nervous, anxious about whether or not visitation was going to occur. She knew when visitation was, so when -- I usually see her the day after her scheduled visitation, and you could tell in her play and just her attitude sometimes whether or not a visit had occurred.
>
> There was a few times where she was taken to the office and mom wasn't there, and so she would the next day tell me about that and how angry she was and upset about that. So since the stopping of the visitation, we've -- I explained to her we're taking a break, we're just not doing it. She seems a lot more comfortable, a lot less anxious. And so I think that it benefited to stop the visitation.

Melissa testified that when Mother did not attend scheduled visits with the children, Marcy returned to the home "on a rampage."

The trial court could have rationally determined that terminating Mother's rights would provide the girls with a positive, permanent, and stable home environment. Concerning the proposed adoptive home, Barrientes testified that Marcy was "very comfortable" and felt "like part of the family"; she had started referring to her proposed adoptive parents as her mom and dad. Melissa testified that Marcy and Beth had been in her care since early February 2014; that she had passed a home study; that she had a large home that could accommodate Marcy, Beth, and four other children; and that Marcy and Beth "get along great" with the other children. According to Melissa, Marcy and Beth adjusted well to living in her home; Marcy's anxiety from when she first began living in the home had subsided. Melissa testified that she would like to adopt Marcy and Beth, that she will meet all of their needs, and that she plans to continue allowing them to frequently visit Mother's other children.

20

When Barrientes discussed the possibility of adoption with Marcy, Marcy initially expressed a desire to live with Mother but eventually said that "she would be okay staying where she was staying."[15] Barrientes opined that termination of Mother's rights was in Marcy's best interest because

> the stability and the consistency that [she received outside of Mother's care was] really helpful for her. I feel like the instability and her being the oldest child -- she did talk about having to take care of her other siblings, younger siblings. I think she was -- from what I'm gathering from [Marcy], was placed in an adult role. She took on a lot of responsibilities. Now she's being asked to be a child, go to school, play, those sorts of things, along with the structure and stability, consistency that she really needs.

The record also contains evidence that the trial court could have weighed against granting the Department's termination petition. Mother testified that when she had custody of the girls, she had helped Marcy with homework, had taken them to the park, and had enjoyed other experiences with them. She acknowledged that she had made bad decisions but opined that she was not a bad parent. She asked the trial court to not terminate her parental rights because she did not want her children to grow up without knowing her, as she had aged without knowing her parents.

Mother testified that Marcy loved her "to death" and was very smart and kind. She described Beth as "sweet" and "always happy." Mother testified that every time she saw Marcy at visits, Marcy asked when she could come home.

---

[15]While Barrientes talked with Marcy in general terms about adoption and told her that she would have new permanent parents, she did not explain to Marcy all of the consequences of the termination of Mother's parental rights.

21

Mother expressed her belief that the termination of her parental rights would cause lasting emotional harm to Marcy. She claimed that although she had not completed her services, she would do so if the trial court gave her more time. According to Andrews, the girls had a good bond with Mother. During visits, they hugged, talked, and laughed freely. Marcy became sad when Andrews told her that she may never see Mother again. Melissa recognized that Marcy has a bond with Mother and conceded that Marcy has expressed that she loves Mother. But Melissa also testified that Marcy had expressed that she wanted to be adopted by Melissa.

Mother contended that she was "willing to do whatever [she had] to do to get [the] kids back." But the trial court could have reasonably disbelieved this statement because she had not, in fact, completed actions that could have caused the children's return to her care.

We conclude that although the trial court could have weighed some facts in favor of returning the children to Mother or giving her more time to complete her service plan, considering the evidence cumulatively under the relevant factors, the trial court could have formed a firm belief or conviction that termination was in the children's best interest. *See C.H.*, 89 S.W.3d at 28; *Holley*, 544 S.W.2d at 371–72. Specifically, the trial court could have reasonably based its best interest finding on Mother's history of using illegal drugs before the children's removal; her continued use of drugs after their removal (including near the time of the trial), when she knew her parental rights were in jeopardy; and her failure

22

complete treatment that could have abated the drug abuse. *See In re J.N.H.*, No. 02-11-00075-CV, 2011 WL 5607614, at *8 (Tex. App.—Fort Worth Nov.17, 2011, no pet.) (mem. op.) (considering a parent's drug history in affirming a trial court's decision that termination was in the best interest of a child); *In re K.W.*, No. 02-07-00458-CV, 2008 WL 2639037, at *4 (Tex. App.—Fort Worth July 3, 2008, no pet.) (mem. op.) (holding that clear and convincing evidence existed that termination of a father's parental rights was in a child's best interest when, among other facts, the father had a pattern of drug abuse).

Additionally, the trial court could have rationally based its best interest finding on Mother's failure to complete her service plan, her lack of income to materially provide for the children, the emotional trauma that she had caused Marcy after her removal, the proposed adoptive family's bond with the children, the proposed adoptive parents' ability to provide permanent stability for them, and Marcy's acceptance of the prospect of adoption. *See* Tex. Fam. Code Ann. § 263.307(a) (West 2014) (stating that the prompt and permanent placement of a child in a safe environment is presumed to be in the child's best interest); *In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (concluding that stability and permanence are important to the growth of a child and affirming a finding that termination was in a child's best interest when the child was thriving in foster care); *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 255 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc) (concluding that a mother's failures to follow a service plan or to

23

attend appointments arranged by the Department supported a trial court's finding that termination was in the child's best interest); *In re U.P.,* 105 S.W.3d 222, 230–31 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on reh'g) (considering a child's bond with a foster family as a factor supporting the child's best interest in the termination of a father's parental rights).

The evidence is factually sufficient to clearly and convincingly support the trial court's finding that termination of Mother's parental rights is in the children's best interest. *See C.H.*, 89 S.W.3d at 28. We overrule Mother's fourth issue.

## Conclusion

Having overruled Mother's second and fourth issues, which are dispositive, we affirm the trial court's judgment terminating Mother's parental rights to Marcy and Beth.

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; MEIER and GABRIEL, JJ.

DELIVERED: February 19, 2015

24