

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00329-CV

———————————————

IN THE INTEREST OF T.M., M.M., C.M., G.M., AND G.M., CHILDREN

On Appeal from the 323rd District Court
Tarrant County, Texas
Trial Court No. 323-106560-18

Before Gabriel, Kerr and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

In January 2018, the Texas Department of Family and Protective Services (Department) initiated this proceeding to terminate the parent–child relationship between G.M. (Father) and A.D. (Mother) and their five children—T.M. (Timothy), M.M. (Michael), C.M. (Calvin), G.M. (Gavin), and G.M. (Gail).[1] The children's paternal grandparents, B.D. (Grandfather) and P.D. (Grandmother), intervened, asking the trial court to appoint them as the children's managing conservator or, alternatively, to award them possession of and access to the children.

After conducting a final hearing, the trial court found grounds to terminate Father's and Mother's parental rights under Family Code Section 161.001(b)(1). The trial court also found that the termination of Father's and Mother's parental rights was in the children's best interest. Based upon those findings, the trial court terminated the parent–child relationship between Father and Mother and the children and named the Department as the children's managing conservator. *See* Tex. Fam. Code Ann. §§ 161.001(b), .207(a). The trial court further denied all relief requested by

---

[1]As this is a parental–rights termination case, we use aliases to refer to the children, their parents, and their grandparents. *See* Tex. R. App. P. 9.8(b)(2) (requiring appellate courts to use aliases to refer to minors in parental–rights termination cases and, if necessary to protect the minors' identities, to also use aliases to refer to their parents and other family members).

Grandfather and Grandmother, rendered judgment that they take nothing, and dismissed them from this suit.

Father, Grandfather, and Grandmother timely appealed from the trial court's order of termination.[2]  We affirm.

## II. BACKGROUND

On January 19, 2018, shortly after Mother gave birth to her youngest child, Gail, the Department received a referral expressing concerns over Gail's well-being because Mother appeared to have sustained physical injuries that would inhibit her ability to adequately care for Gail.  Tawanna Jackson, an investigator with the Department, was assigned to investigate the referral, and she contacted staff at the hospital where Gail had been born in order to learn more about the worries over Gail's welfare.  By the time Jackson was able to reach out to the hospital staff, however, Mother and Gail had been discharged and were no longer at the hospital. Mother's hospital records indicated that she lived at a residence located in North Richland Hills, so Jackson went to that address in an effort to contact Mother.[3]  But when Jackson arrived at the North Richland Hills residence, nobody was there, so Jackson returned the next day, again to no avail.

---

[2]Mother did not appeal the trial court's termination of her parental rights.

[3]Throughout this opinion, we refer to this specific residence simply as the "North Richland Hills residence."

3

Jackson continued her efforts to locate Mother, and at some point during her search, Jackson learned that Mother had four other children: Timothy, Michael, Calvin, and Gavin. Jackson's attempts to locate Mother and her children were not fruitful, and she still had not located them by January 22, 2018, the day the Department received another referral indicating that Mother had been hospitalized in Alabama as a result of an assault by Father. Mother's medical records related to that hospital visit reflect that Mother told hospital personnel that Father had assaulted her in Texas over a period of hours by beating her with metal bars and rods; by biting, kicking, and punching her; by burning her with boiling water and heated tools; and by cutting her hair. Mother reported that she had eventually been able to escape Father's assault, had boarded a Greyhound bus in Dallas, and had ridden the bus to Alabama, where she had family. An examination revealed that Mother had a fractured right distal ulna, two fractured ribs, a traumatic subdural hematoma, a spleen laceration, and several lumbar transverse process fractures, as well as multiple bruises, burn wounds, bite marks, and lacerations.

The January 22, 2018 referral contained information indicating that Father's assault of Mother had occurred at the North Richland Hills residence. And while that referral alerted Jackson to Mother's location, Jackson still did not have any information as to the children's whereabouts. Concerned about the children's safety, Jackson placed them on a child-safety-check alert list. On January 23, 2018, Jackson learned that law enforcement had located the children at a motel in Grand Prairie, and

4

she went to that location to assist with the children. When Jackson arrived, she learned that Father, Grandfather, Grandmother, and the children were all present at the motel and that Father, Grandfather, and Grandmother had all been placed under arrest—Father for assaulting Mother, and Grandfather and Grandmother for failing to report the assault.

When Jackson met with the children at the motel, they appeared to be healthy and well fed. But with Mother in a hospital in Alabama and Father, Grandfather, and Grandmother in the custody of law enforcement, the Department performed an emergency removal of the children and placed them into foster care. The Department also initiated this proceeding to terminate Father's and Mother's parent–child relationship with the children. A short time after the children's emergency removal, Grandfather and Grandmother were released from custody pending the resolution of charges for failure to report a felony that were filed against each of them. Father, however, remained in custody with charges of aggravated assault and of aggravated sexual assault pending against him.[4]

Jackson visited with Father regarding potential placements for the children, and Father indicated that he wanted the children placed with Grandmother. Father also indicated that prior to the children's removal, he, Mother, the children, Grandfather,

---

[4]By the time of the termination hearing, Father had pleaded guilty to the aggravated-assault and aggravated-sexual-assault charges and had been sentenced to twenty-five years' confinement for each count. Grandfather's and Grandmother's failure-to-report charges were still pending at the time of the termination hearing.

and Grandmother had been living at the North Richland Hills residence. Grandfather and Grandmother also told Jackson that they were living at the North Richland Hills residence. Jackson accompanied law-enforcement officers as they executed a warrant at the North Richland Hills residence. Once inside, Jackson noticed the refrigerator in the kitchen was "filthy" and had no food inside other than some spoiled milk.

Upon walking further into the North Richland Hills residence, Jackson noticed that one of the downstairs bedrooms contained nothing but a mattress, which had neither a box spring nor bedding. Another downstairs bedroom had only a box spring and mattress, with no bedding. The living room contained only a couch, a coffee table, a television, and a playpen, which Jackson noticed was "filthy." When Jackson went upstairs, she saw some of Father's clothes, as well as blood on the carpet near a window. Jackson also looked at the bathrooms in the residence and saw that they were "filthy," that they did not have any toiletries or linens inside, and that they did not appear to be in working order. Additionally, there was no electricity or running water at the residence.

When the children first came into the Department's care after the emergency removal in January 2018, Timothy was six years old, Michael was five, Calvin was three, Gavin was one, and Gail was a newborn. According to caseworker Denise Dull, at the time the children came into the Department's care, they exhibited deficiencies with respect to their expected level of educational development; Timothy and Michael had rotting teeth; and none of the children were current on any of their

6

vaccinations.  Initially, the Department placed the children across three foster homes, but within a short time, it was able to place all five children together in the same foster home.

Not long after the Department placed the children in foster care, Timothy began receiving behavioral-therapy services from Angelle Harris, and during those sessions, he made outcries that Father, Grandfather, and Grandmother had abused him and his siblings in the North Richland Hills residence.  As to Father, Timothy told Harris that Father would beat him, that he had seen Father choke Michael, and that Father had tried to drown one of Timothy's younger siblings.  Timothy referred to Father as a "bad man" because, he told Harris, Father hurt him all the time.

Timothy also reported that Father abused Mother.  He said that Father would beat Mother until she was bloodied, at which point Father would place Mother in the same room as Timothy.  He also stated that Father forced Mother to do "nasty things" with other males, and he specifically mentioned that he had witnessed Father coerce Mother into a situation in which she was surrounded by other men's private parts.

Timothy's outcries regarding Grandfather and Grandmother were that they would beat him with wires and that he had witnessed Grandfather beat Grandmother as well.  Timothy also reported that Grandfather and Grandmother would beat Mother.  Timothy stated that Grandfather and Grandmother were in the home when Father would beat him and that they never intervened to protect him.  As he had with

Father, Timothy referred to Grandfather as a "bad man" because Grandfather would beat him like Father did.

Harris also witnessed an outcry of abuse from Michael, in which he stated that Father had choked him in the presence of Grandfather and Grandmother. And on one occasion, Harris observed Timothy and Michael playing with one another, and as part of their playing, Timothy demonstrated on Michael how Father had choked Michael. Timothy and Michael also showed how Grandfather and Grandmother would beat them with wires and other household items.

Dull witnessed outcries from the children that were in addition to the outcries Harris witnessed. Some of those additional outcries came from Timothy, and they again consisted of claims that Father, Grandfather, and Grandmother had abused the children in the North Richland Hills residence. According to Dull, Timothy said that if he and his siblings did not eat fast enough, Grandmother would dump their food on top of their heads. He also told Dull, as he had told Harris, that Grandfather and Grandmother had been present at times when Father had beaten him but that they had never done anything to stop the beatings. Timothy further reported that Father had slapped recently born Gail and that he had spit in her face. He also said that Grandfather and Grandmother hit him.

Dull also witnessed additional outcries from Michael. He indicated to her that a scar on his back was the result of Father stabbing him. Michael further reported that he had witnessed Father beat and stab Mother. Michael said that Father would

8

force him and Timothy to lay on top of Mother while they were all naked, and he further said that Father would make him and Timothy put their faces in Mother's private area.

Based on the children's outcries, Dull believed that they had observed sexual activity between adults inside the North Richland Hills residence. Observations of that nature would constitute abuse, according to Dull, because a young child's exposure to sexual activity between adults can cause the child to experience emotional trauma. A couple of things led Dull to conclude that the children had been exposed to sexual activity between adults: Timothy reported witnessing Grandfather and Grandmother sleeping naked next to each other in bed at the North Richland Hills residence, and both he and Michael exhibited sexualized behaviors and sexual acting out after the Department's emergency removal.

With regard to the sexualized behaviors, Dull provided an example. On one occasion, Michael told Calvin to pull Michael's pants down and then told Calvin to touch Michael's private parts with his mouth. When Dull asked Michael why he had done that, Michael responded that Father had made him perform that act on Father and Timothy when the family lived in the North Richland Hills residence, and Michael further indicated that this had been a normal behavior in the home.

The trial court terminated Father's and Mother's parental rights to all five children and denied all relief requested in Grandfather's and Grandmother's petition in intervention. Father, Grandfather, and Grandmother appealed.

9

## III.  DISCUSSION

### A.    Father's Appeal

Father's appointed appellate counsel has filed a brief stating that he has conducted a professional evaluation of the record and has concluded that there are no arguable grounds to be advanced to support an appeal by Father of the trial court's order terminating his parental rights and that any such appeal would be frivolous. Father's counsel's brief presents the required professional evaluation of the record demonstrating why, with respect to Father, there are no reversible grounds on appeal and referencing any grounds that might arguably support the appeal. *See Anders v. California*, 386 U.S. 738, 744, 87 S. Ct. 1396, 1400 (1967); *see also In re K.M.*, 98 S.W.3d 774, 776–77 (Tex. App.—Fort Worth 2003, order) (holding *Anders* procedures apply in parental-termination cases), *disp. on merits*, No. 2-01-349-CV, 2003 WL 2006583 (Tex. App.—Fort Worth May 1, 2003, no pet.) (mem. op.).  Further, Father's counsel informed Father of his right to request the record and to file a pro se response. *See Kelly v. State*, 436 S.W.3d 313, 318–20 (Tex. Crim. App. 2014).  In addition, this court informed Father of these rights and gave him the opportunity to notify this court of his intent to respond.  Father has not filed a response.  The Department has notified this court that it agrees with Father's counsel that Father has no grounds assailing the trial court's order of termination.

In reviewing a brief that asserts an appeal is frivolous and that fulfills the requirements of *Anders*, this court is obligated to undertake an independent

10

examination of the record to determine if any arguable grounds for appeal exist. *See In re C.J.*, 501 S.W.3d 254, 255 (Tex. App.—Fort Worth 2016, pets. denied) (citing *Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991)). Having carefully reviewed the record, Father's counsel's brief, and the Department's response, we conclude that there are no arguable grounds for reversal of the trial court's order terminating Father's parental rights; thus, we agree with Father's counsel that Father's appeal is without merit. *See In re D.D.*, 279 S.W.3d 849, 850 (Tex. App.—Dallas 2009, pet. denied). We will therefore affirm the trial court's order of termination as to Father. *See* Tex. R. App. P. 43.2(a). Counsel has a continuing duty to represent Father until he has exhausted his proceedings, including possibly filing a petition for review in the supreme court. *See In re P.M.*, 520 S.W.3d 24, 27–28 (Tex. 2016); *In re D.T.*, No. 02-17-00061-CV, 2017 WL 2806323, at *1–3 (Tex. App.—Fort Worth June 29, 2017, no pet.) (mem. op.).

## B. Grandfather's and Grandmother's Appeal

In their challenges to the trial court's termination order, Grandfather and Grandmother both present the same, single issue.[5] They claim that the trial court abused its discretion by naming the Department as the children's permanent managing conservator. They contend that the trial court should have instead named

---

[5]Grandfather and Grandmother filed separate briefs, but those briefs are identical in nearly every respect; thus, we will address their issues together.

them as the children's managing conservator because the evidence conclusively shows that arrangement was in the children's best interest.

### 1. Applicable law and standard of review

The Texas Family Code creates a rebuttable presumption that a parent will be named a child's managing conservator unless the court finds that such appointment would not be in the child's best interest "because the appointment would significantly impair the child's physical health or emotional development." Tex. Fam. Code Ann. § 153.131(a). But here, the trial court terminated the parent–child relationship of both parents. In such cases, "the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code Ann. § 161.207(a); *see In re R.H.*, No. 05-19-00635-CV, 2019 WL 4875334, at *5 (Tex. App.—Dallas Oct. 3, 2019, no pet.) (mem. op.).

Termination of parental rights and appointment of a non-parent as sole managing conservator are two distinct issues, differing in elements, standards of proof, and standards of review. *See In re J.A.J.*, 243 S.W.3d 611, 615–17 (Tex. 2007). *Compare* Tex. Fam. Code Ann. § 161.001, *with id.* § 153.131(a). Unlike the facts necessary to support termination of parental rights, the facts necessary to appoint a non-parent as sole managing conservator need be established by a mere preponderance of the evidence. *See* Tex. Fam. Code Ann. § 105.005; *J.A.J.*, 243 S.W.3d at 616; *In re W.M.*, 172 S.W.3d 718, 724 (Tex. App.—Fort Worth 2005, no

12

pet.). Likewise, the standard of review for the appointment of a non-parent as sole managing conservator is less stringent than the standard of review for termination of parental rights. *J.A.J.*, 243 S.W.3d at 616. We review a trial court's appointment of a non-parent as sole managing conservator for an abuse of discretion only. *Id.*; *W.M.*, 172 S.W.3d at 724. Therefore, we may reverse the trial court's appointment of a non-parent as sole managing conservator only if we determine the appointment is arbitrary or unreasonable. *J.A.J.*, 243 S.W.3d at 616; *In re L.G.R.*, 498 S.W.3d 195, 207 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *W.M.*, 172 S.W.3d at 724–25.

Under an abuse-of-discretion standard, legal and factual sufficiency are not independent grounds for review, but they are relevant factors in deciding whether an abuse of discretion occurred. *In re E.P.C.*, 381 S.W.3d 670, 687 (Tex. App.—Fort Worth 2012, no pet.) (citing *W.M.*, 172 S.W.3d at 725). In determining whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we engage in a two-pronged inquiry: (1) did the trial court have enough information upon which to exercise its discretion; and (2) did the trial court err in applying its discretion? *W.M.*, 172 S.W.3d at 725. The traditional sufficiency review comes into play with regard to the first question. *Id.* With regard to the second question, we determine, based on the elicited evidence, whether the trial court made a reasonable decision. *Id.*

The primary consideration in determining issues of conservatorship is the best interest of the child. Tex. Fam. Code Ann. § 153.002; *W.M.*, 172 S.W.3d 725. In

13

determining a child's best interest in the context of a conservatorship decision, courts may use the list of *Holley* factors.  *See W.M.*, 172 S.W.3d at 725 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied); *Long v. Long*, 144 S.W.3d 64, 68 (Tex. App.—El Paso 2004, no pet.).  Those factors include:

> (1) the desires of the child;
>
> (2) the emotional and physical needs of the child now and in the future;
>
> (3) the emotional and physical danger to the child now and in the future;
>
> (4) the parental abilities of the individuals seeking custody;
>
> (5) the programs available to assist these individuals to promote the best interest of the child;
>
> (6) the plans for the child by these individuals or by the agency seeking custody;
>
> (7) the stability of the home or proposed placement;
>
> (8) the acts or omissions of the parent which may indicate that the existing parent–child relationship is not a proper one; and
>
> (9) any excuse for the acts or omissions of the parent.

*Holley*, 544 S.W.2d at 372; *W.M.*, 172 S.W.3d at 725–26.  These factors are not exhaustive; some of them may be inapplicable in specific cases, and courts may consider others not on the list when appropriate.  *See W.M.*, 172 S.W.3d at 725.

### 2. Analysis

At the outset, we note that there is no presumption favoring a grandparent over other non-parents in determining conservatorship. *In re A.C.*, 394 S.W.3d 633, 644 (Tex. App.—Houston [1st Dist.] 2012, no pet.). With that in mind, and considering the evidence elicited at the termination hearing in light of the relevant *Holley* factors, we conclude the trial court did not abuse its discretion by appointing the Department, rather than Grandfather or Grandmother, as the children's managing conservator upon terminating Father's and Mother's parental rights.

> **a.** *The emotional and physical needs of the children and the emotional and physical danger to the children*

We begin with these *Holley* factors given the considerable evidence indicating that while the children were living in the North Richland Hills residence, Grandfather and Grandmother subjected them to a pattern of conduct that endangered their physical and emotional welfare. Grandfather and Grandmother suggest that evidence of past conduct toward a child is not relevant when assessing these factors. But that is not so. Evidence of a person's past misconduct or neglect can be used to measure that person's future conduct. *See In re B.P.E.*, No. 01-16-00561-CV, 2016 WL 6803355, at *8 (Tex. App.—Houston [1st Dist.] Nov. 17, 2016, pet. denied) (mem. op.); *In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied). Thus, in weighing these *Holley* factors, the trial court was entitled to consider any evidence reflecting that when Grandfather and Grandmother had access to the children in the

past, they engaged in a pattern of conduct that endangered the children's physical and emotional well-being.

And the record contains a litany of evidence that Grandfather and Grandmother endangered the children. In particular, there was evidence that Grandfather and Grandmother physically abused the children, as well as evidence that the children witnessed violence involving Grandfather and Grandmother. *See In re J.S.-A*, No. 01-17-00491-CV, 2018 WL 891236, at *8 (Tex. App.—Houston [1st Dist.] Feb. 15, 2018, pets. denied) (mem. op.) ("Evidence of domestic violence in the home supports a finding that placement with the parent is likely to subject the child to emotional and physical danger now and in the future."); *In re A.K.*, Nos. 07-17-00353-CV, 07-17-00354-CV, 2018 WL 912703, at *5 (Tex. App.—Amarillo Feb. 15, 2018, pet. denied) (mem. op.) ("A child's exposure to domestic violence in the home is relevant when considering best interest."); *B.P.E.*, 2016 WL 6803355, at *8. We discuss each of those categories in turn.

Although the children did not testify at the hearing, evidence of their outcries was admitted through other means, including the testimony of Harris and Dull, who testified about Timothy's and Michael's outcries; a copy of forensic interviews that had been performed on Timothy and Michael; testimony from Department investigator Jessie Davis about an investigation she conducted that included outcries from Timothy and Michael; and testimony from both Dull and one of the Department's conservatorship supervisors, Lauren Robinson, regarding the

16

Department's opposition to Grandfather's and Grandmother's request for conservatorship of the children.

In setting forth the background of this case above, we outlined Timothy's and Michael's outcries of abuse, and we need not duplicate the substance of those outcries here. But we do highlight some additional evidence that relates to Grandfather's and Grandmother's endangering conduct. Specifically, we note that Timothy told the forensic interviewer that Grandfather would beat him with a belt all over his body and that Grandfather and Grandmother would beat him with sticks on his arms and legs. Additionally, Davis testified that based on Timothy's and Michael's forensic interviews, the Department reached a "reason to believe" disposition against Grandfather and Grandmother for physical abuse of Timothy and Michael. Dull opined that based on the children's outcries and her experience as a caseworker, she believed the children would be in physical and emotional danger if the trial court placed them with Grandfather and Grandmother. And Robinson testified that the Department opposed Grandfather's and Grandmother's request for conservatorship in part because of the children's outcries that Grandfather and Grandmother had physically abused them.

Grandfather and Grandmother attempt to discredit the evidence showing they physically abused the children by suggesting that it is unclear whether the children's outcries conveyed real, as opposed to imagined or dreamed, experiences. They point to a portion of Harris's testimony that Grandmother elicited on cross-examination in

17

which Harris agreed that because she is not a licensed child psychologist, she could not know whether Timothy's outcries of abuse conveyed real experiences:

> Q.  You're not a licensed child psychologist either.
>
> A.  No.
>
> Q.  So we really don't know where these things that [Timothy] was telling you came from, whether they were imagination, what some adult told him, something he really witnessed, a dream, or [a] combination of [the] above; right?
>
> A.  Yes.

To the extent that Grandfather and Grandmother contend that this isolated portion of one witness's testimony conclusively negates a finding that they physically abused the children, we disagree.  To begin, Grandfather and Grandmother present this exchange shorn from its relevant context, resulting in an incomplete and inaccurate picture of Harris's testimony.  For example, on redirect, Harris confirmed that based upon her observations as Timothy's behavioral therapist, she believed his outcries had described real experiences:

> Q.  Did you observe anything in your interactions with [Timothy] that would support [Grandmother's] contention that this may have been imaginary or misremembered?
>
> A.  [Timothy's], often during each session when talking about his feelings, very tearful.  And, right now, he's experienced incontinence.  So, yes.
>
> Q.  So you believe them to be true?
>
> A.  Yes.

18

Q. True experiences?

A. Yes.

Additionally, the isolated portion of Harris's testimony that Grandfather and Grandmother rely upon to show that they did not physically abuse the children does not erase all the other evidence in the record concerning that issue. In other words, at most, the portion of Harris's testimony upon which Grandfather and Grandmother rely to show they did not physically abuse the children conflicts with other evidence, including other portions of Harris's testimony, showing that they did. And as fact-finder here, the trial court could have resolved that conflict by believing the evidence showing that Grandfather and Grandmother physically abused the children, which is a determination that we may not second-guess. *See Bush v. Bush*, 336 S.W.3d 722, 730 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("In a bench trial, the trial court is the sole judge of the credibility of the witnesses, assigns the weight to be given their testimony, may accept or reject all or any part of their testimony, and resolves any conflicts or inconsistencies in the testimony." (quoting *Rich v. Olah*, 274 S.W.3d 878, 884 (Tex. App.—Dallas 2008, no pet.)).

The record also contains evidence that the children were exposed to violence involving Grandfather and Grandmother in the North Richland Hills residence. Harris testified that Timothy indicated that he had witnessed Grandfather beating Grandmother, as well as both Grandfather and Grandmother beating Mother. During his forensic interview, Michael stated that he had witnessed Grandfather

19

fighting with Father. And Timothy indicated during his forensic interview that he had seen Grandmother grab a knife and threaten to cut Mother's neck.

Although a large portion of the evidence we have outlined above references specific acts of abuse that Grandfather and Grandmother committed against Timothy and Michael, that evidence nevertheless supports a finding that granting Grandfather's and Grandmother's request for conservatorship as to Calvin, Gavin, and Gail would endanger their physical and emotional well-being just as it would Timothy's and Michael's. *See In re A.W.B.*, No. 14-11-00926-CV, 2012 WL 1048640, at *6 (Tex. App.—Houston [14th Dist.] Mar. 27, 2012, no pet.) (mem. op.) (noting that evidence that a child's parent abused the child's seven other siblings can support a finding that returning the child to the parent could result in emotional and physical danger to the child); *cf. In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *11 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) (noting that "the physical abuse of one child in the home supports a finding of endangerment as to the other children also present in the home."); *In re J.W.M.*, 153 S.W.3d 541, 548 (Tex. App.—Amarillo 2004, pet. denied) ("The evidence offered to prove the grounds for termination is also relevant in determining if termination is in the children's best interest"). We also reiterate that Dull testified that the physical and emotional well-being of all five of the children would be endangered if they were placed with Grandfather and Grandmother. And Robinson testified that the Department

opposed giving Grandfather and Grandmother conservatorship over any of the children based on the outcries of abuse against them.

In contrast to the substantial evidence reflecting that Grandfather and Grandmother posed a danger to the children's physical and emotional well-being, Grandfather and Grandmother do not assert, let alone refer us to any evidence showing, that the Department posed any such risk. Given the evidence adduced at the termination hearing, the trial court could have reasonably concluded that these factors weighed heavily in favor of a finding that naming the Department, rather than Grandfather and Grandmother, as the children's managing conservator was in the children's best interest.

b.      *Parenting abilities of Grandfather and Grandmother; stability of the home; and the acts or omissions of Grandfather and Grandmother*

In this case, these three *Holley* factors are closely related to the previous two. As we have noted, the evidence reflects that during the Department's investigation throughout this case, Father, Grandfather, and Grandmother reported that prior to the children's removal, Father, Mother, Grandfather, Grandmother, and the children all lived together at the North Richland Hills residence. We described above some of the evidence showing that the children were both physically abused by Grandfather and Grandmother and exposed to violence involving Grandfather and Grandmother while residing in that home. But there is also evidence that Grandfather and Grandmother failed to protect the children from significant abuse Father inflicted

21

upon them and Mother in the home. *Cf. In re O.E.R.*, 573 S.W.3d 896, 908 (Tex. App.—El Paso 2019, no pet.) (noting that trial court could have weighed acts-or-omissions *Holley* factor in favor of termination based on evidence showing mother repeatedly exposed children to domestic violence by engaging in multiple relationships with men who physically abused her); *In re R.J.*, 579 S.W.3d 97, 116 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (noting that evidence of domestic violence in the home is relevant to the parenting-abilities and stability-of-the-home *Holley* factors).

We need not repeat the evidence of Father's abuse of the children that we have already referenced in setting out the background of this case. In addition to that evidence, the record shows that during their respective forensic interviews, Timothy and Michael described acts of abuse that Father inflicted upon them. Michael stated that Father forced him to say, "I hate you mama," and then hit him in the nose with a shoe. Timothy stated that he saw blood coming from Michael's nose after Father hit Michael with a shoe. Timothy reported that Father hit him with a wire, a bar, and a broom, and he showed the forensic interviewer marks and bruises on his arm that had resulted from Father's hitting him with the broom. And as previously noted, in speaking with Harris, Timothy referred to Father as a "bad man" because Father hurt him all the time.

As to the children's exposure to Father's physical abuse of Mother in the North Richland Hills residence, the evidence includes Mother's hospital records, which, as we have already outlined, reflect that she sustained multiple, serious injuries as a result

22

of an assault by Father shortly after Gail was born. In addition, the trial court admitted two judgments of conviction reflecting that Father was convicted of aggravated assault and aggravated sexual assault against Mother. Further, during his forensic interview, Michael stated that he had witnessed Father hit Mother in the face with a wire, with a broom, and with his hand in the North Richland Hills residence and that Mother had to wipe blood from her face. During his forensic interview, Timothy stated that Father would jump on Mother's head, that Father would elbow Mother in the mouth, that Father would hit Mother with a needle and a board, and that Father would burn Mother with cigarettes until her eyes rolled in the back of her head. Timothy further reported that he saw blood all over the house.

In light of the above, the trial court could have reasonably concluded that Grandfather and Grandmother were aware of Father's abuse of the children, as well as the children's exposure to Father's abuse of Mother, but did nothing to protect the children from it. Additionally, according to Grandmother's testimony, she and Grandfather were the ones who had actually raised the children, not Father and Mother. The trial court could have considered that testimony and weighed it in light of Jackson's testimony that when she went inside the North Richland Hills residence, it was filthy, had no running water or electricity, did not have a functioning bathroom, was not properly stocked with food, and did not have sufficient bedding for the four adults and five children who were living there. And based on its weighing of that evidence, the trial court could have reasonably concluded that Grandfather and

23

Grandmother had not demonstrated an ability to adequately parent the children or to provide them with a stable home.

We conclude that the trial court could have reasonably found that the parenting-abilities, stability-of-the-home, and acts-or-omissions factors all weighed in favor of a finding that naming the Department, rather than Grandfather and Grandmother, as the children's managing conservator was in the children's best interest.

       c.     *Children's desires*

Although none of the children testified at the termination hearing, and although some of the children were too young to directly voice their desires concerning conservatorship, there was other evidence that the trial court could have considered when analyzing the children's desires with respect to conservatorship. For example, when Dull asked Timothy if he felt connected to Grandfather and Grandmother, he said he did not. Conversely, when Dull asked Timothy to name the people he felt connected to, he replied that he felt connected to his foster parents, to his CASA worker,[6] and to Dull, and when Dull asked him why, he said, "Because I'm not in that bad place anymore." Dull also testified that when she asked the children where they wanted to live, "they said they wanted to stay in [their foster home]

---

[6]"CASA" stands for "court-appointed special advocate." *See In re I.D.J.*, No. 02-11-00367-CV, 2012 WL 2135579, at *3 (Tex. App.—Fort Worth June 14, 2012, no pet.) (mem. op.).

24

because it's safe and they liked it there and they did not get hit." When explaining why the Department believed termination of Father's and Mother's parental rights and denial of Grandfather's and Grandmother's request for conservatorship was in the children's best interest, Dull stated the reason was because the children had "expressed that they want[ed] to be in a loving family that doesn't hurt them." And the children's foster mother testified that the children called her "mom." Based on this evidence, the trial court could have reasonably found that this factor weighed in favor of a finding that naming the Department, as opposed to Grandfather and Grandmother, as the children's managing conservator was in their best interest.

### d. *Plans for the children*

Grandfather and Grandmother assert that their plans for the children in the event that they were awarded conservatorship demonstrate that appointing them as the children's managing conservator was in their best interest. They point to Grandmother's testimony that she planned to enroll Timothy and Michael in school once Michael was old enough because she wanted both children to attend school together. They also point to Grandmother's testimony that the children are Romani and that she planned to raise them in the Romani culture. And they assert that the children could remain together if they were placed with them.

Despite Grandmother's testimony, however, the trial court did not have to conclude that Grandfather's and Grandmother's plans for the children were in the children's best interest, particularly when weighed against the Department's plans.

25

Grandmother testified that she planned to enroll Timothy and Michael in school in the future. The trial court could have viewed this testimony with a high degree of skepticism based on the evidence showing that Grandmother had never enrolled any of the children in school despite the fact that, according to her own testimony, she and Grandfather were the ones who were actually raising the children. This stands in contrast to the testimony of the children's foster mother, who testified that while living with their foster family, Timothy and Michael had been attending school and were doing "really good" at it.

Additionally, as noted, the Department had placed the children together in the same foster home, and they had been living there for nearly a year before the termination hearing. While in the foster home, Timothy, Michael, Calvin, and Gavin had received therapeutic services that included trauma therapy, behavioral therapy, psychiatric services, trauma-based relationship intervention, and speech therapy. According to Robinson, the Department planned for an unrelated adoption of the children together as a sibling group of five, and the children's foster mother testified that she and her husband would consider adopting the children if that became an option. Further, Robinson testified that the children would need to continue receiving trauma counseling, behavioral therapy, and trauma-based relationship intervention in the future. Robinson stated that the children were receiving those services in the foster home, indicating that the foster family was adequately meeting the children's therapeutic needs and would continue to do so in the future. And

Robinson confirmed that the Department would provide those services to the children in the future in the event the children were adopted.

In light of the above, we conclude that the trial court could have reasonably determined that this factor weighed in favor of its finding that naming the Department, rather than Grandfather and Grandmother, as the children's managing conservator was in the children's best interest.

e.    *Children's culture*

Finally, though it is not among the *Holley* factors, Grandfather and Grandmother assert that the fact that the children are Romani should weigh in favor of awarding conservatorship to their Romani grandparents, who can raise them in a manner consistent with Romani culture. In doing so, Grandfather and Grandmother analogize their family's Romani culture to the unique considerations at issue in child custody cases involving an Indian child, to which the Indian Child Welfare Act (ICWA) applies. *See* 25 U.S.C.A. § 1912(a). They suggest that for the same reasons ICWA provides special considerations in child custody cases involving Indian children, they should be awarded conservatorship of the children so they can be raised in their Romani culture.

We decline Grandfather's and Grandmother's invitation to analogize this case to one involving an Indian child. ICWA is a federal statute, and Grandfather and Grandmother have cited us to no analogous statute providing similar protections in child custody cases involving children from a Romani background. Further,

27

Grandfather and Grandmother have cited us to no authority supporting the notion that in cases like this one, in which both parents' parental rights have been terminated, a non-Indian child's cultural background should be given conclusive weight in the trial court's conservatorship decision such that the trial court must award a non-parent family member conservatorship of the child without regard to its analysis of the other factors relevant to a best-interest determination. Here, even considering the children's Romani background, the trial court could reasonably have concluded, based on the factors discussed above, that naming Grandfather and Grandmother as the children's managing conservator was not in the children's best interest.

   *f. Summary*

  Having considered the record in light of the applicable *Holley* factors, we conclude that the trial court had enough information upon which to exercise its discretion and that it did not err in exercising that discretion by finding that appointing the Department, rather than Grandfather and Grandmother, as the children's managing conservator was in the children's best interest. Accordingly, the trial court did not abuse its discretion by naming the Department as the children's managing conservator. *See W.M.*, 172 S.W.3d at 725. We overrule Grandfather's and Grandmother's sole issues.

## IV. CONCLUSION

Having agreed with Father's counsel that Father's appeal is frivolous, and having overruled Grandfather's and Grandmother's sole issues, we affirm the trial court's order of termination. *See* Tex. R. App. P. 43.2(a).

/s/ Dana Womack

Dana Womack
Justice

Delivered: February 3, 2020